## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| LINYI CHENGEN IMPORT AND EXPORT CO., LTD., | ) |
| Plaintiff, | ) |
| and | ) |
| CELTIC CO., LTD. ET AL., | ) |
| Consolidated Plaintiffs, | ) |
| v. | ) Consol. Ct. 18-00002 |
| UNITED STATES, | ) |
| Defendant, | ) NONCONFIDENTIAL |
| and | ) VERSION |
| COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD | ) |
| Defendant-Intervenor. | ) |

**CONSOLIDATED PLAINTIFFS TARACA PACIFIC, INC., CANUSA WOOD PRODUCTS LTD., CONCANNON CORP. DBA CONCANNON LUMBER COMPANY, FABUWOOD CABINETRY CORPORATION, HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC, AND USPLY LLC COMMENTS IN OPPOSITION TO THE THIRD REMAND REDETERMINATION**

Jeffrey S. Grimson
Jill A. Cramer
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW
Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

May 3, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. II

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

STANDARD OF REVIEW .................................................................................. 2

ARGUMENT ..................................................................................................... 2

I.    COMMERCE FAILED TO FOLLOW THE STATUTE, CASE LAW AND
IGNORED RECORD EVIDENCE IN CALCULATING THE ANTIDUMPING DUTY
RATE FOR THE SEPARATE RATE PLAINTIFFS .............................................. 2

A.   THE STATUTE AND CASE LAW PRECEDENT REQUIRE A REASONABLE
SEPARATE RATE ............................................................................................. 2

B.   COMMERCE'S CONCLUSION THAT CHENGEN'S RATE IS NOT RELIABLE IS
NOT SUPPORTED BY THE RECORD ................................................................ 4

C.   USE OF THE CHINA-WIDE ENTITY AFA RATE TO CALCULATE THE
SEPARATE RATE IS UNREASONABLE ........................................................... 11

D.   THE PETITION ANTIDUMPING DUTY RATE IS DISTORTIVE ........................... 14

II.   TARACA ET AL. JOIN THE COMMENTS BEING FILED BY CHENGEN AND
OTHER RESPONDENT PARTIES .................................................................... 18

CONCLUSION .............................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Huttenwerke v. United States, 28 CIT 94, 310 F. Supp. 2d 1347 (2004)........... 2

Albemarle Corp. v. United States, 821 F.3d 1345 (Fed. Cir. 2016) ..................................... *passim*

Atl. Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984) ............................................... 12

Bosun Tools Co. v. United States, __ CIT __, 463 F. Supp. 3d 1308 (2020)................................ 5

Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006 (Fed. Cir. 2017)....................... 5

Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,
     701 F.3d 1367 (Fed. Cir. 2012)........................................................................................ 4

Godaco Seafood Joint Stock Co. v. United States,
     Ct. No. 18-00063, 2021 Ct. Intl. Trade LEXIS 4 (Jan. 6, 2021)................................ 5

Linyi Chengen Import & Export Co., Ltd. v. United States,
     __ CIT __, 487 F. Supp. 3d 1349 (2020) ........................................................... *passim*

Mueller Comercial De Mexico v. United States, 753 F.3d 1227 (Fed. Cir. 2014)....................... 4

Navneet Publ'ns (India) Ltd. v. United States, __ CIT __, 999 F. Supp. 2d 1354 (2014)...... 13, 14

NMB Sing. Ltd. v. United States, 28 CIT 1252 F. Supp. 2d 1327 (2004)..................................... 2

Seah Steel Vina Corp. v. United States, 950 F.3d 833 (Fed. Cir. 2020)....................................... 12

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ............................................................. 12

Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir. 2013). ... *passim*

**Statutes**

19 U.S.C. § 1516a ........................................................................................................................ 2

19 U.S.C. § 1673d......................................................................................................................... 3, 16

THE URUGUAY ROUND AGREEMENTS ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. REP.
     No. 103-316 at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ................................. 3

**Authorities**

Multilayered Wood Flooring From the People's Republic of China: Final Results of
     Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial
     Rescission; 2015–2016, 83 Fed. Reg. 35,461 (Dep't of Commerce July 26, 2018)................ 16

Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Final
     Determination of Sales at Less Than Fair Value, 75 Fed. Reg. 41,808 (Dep't of Commerce
     July 19, 2010)...................................................................................................................... 19

## INTRODUCTION AND SUMMARY OF ARGUMENT

In accordance with Rule 56.2(h) of the Rules of the U.S. Court of International Trade and the order issued by this Court on January 19, 2021, ECF No. 138, Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC and USPly LLC (collectively "Taraca et al."), submit these comments in response to the third remand redetermination filed by the Department of Commerce.  See Final Results of Redetermination Pursuant to Court Remand, Linyi Chengen Imp. & Exp. Co., Ltd. v. United States, Ct. No. 18-00002 (Mar. 22, 2021) (Public Version), ECF No. 144 ("Final Results").[1]

In its opinion remanding this case to Commerce for a third time, the Court stated that "Commerce cited no credible economic evidence on the record showing that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate or connecting the Separate Rate Plaintiffs' dumping margins with the rate of 57.36% that was derived from the average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%."  Linyi Chengen Imp. & Exp. Co., Ltd. v. United States, __ CIT __, 487 F. Supp. 3d 1349, 1358-59 (2020) ("Chengen III").  The Court then directed Commerce to "demonstrate{} that Linyi Chengen's 0% dumping margin rate would not be reasonably reflective of the Separate Rate Plaintiffs' potential dumping margins based on substantial evidence."  Id., __ CIT at __, 487 F. Supp. 3d at 1358.  As discussed below, Commerce improperly implemented this Court's remand order in Chengen III by continuing to apply a 57.36 percent separate rate because Commerce's adopted calculation methodology is unreasonable and is not supported by substantial evidence.  See Final Results at 25.

---

[1]  All citations to the Final Results are to the public version unless otherwise indicated. "P.R." and "C.R." refer to public and confidential investigation record documents, respectively.

## STANDARD OF REVIEW

The Court reviews remand determinations for compliance with its remand order.  See NMB Sing. Ltd. v. United States, 28 CIT 1252, 1260, 341 F. Supp. 2d 1327, 1334 (2004) (affirming on remand where agency determinations were in accordance with law, supported by substantial evidence and otherwise satisfied the remand order).  Any factual findings on remand must be supported by substantial evidence and the agency's legal determinations must be in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B); see also, e.g., AG der Dillinger Huttenwerke v. United States, 28 CIT 94, 106, 310 F. Supp. 2d 1347, 1358 (2004).

## ARGUMENT

I.   **COMMERCE FAILED TO FOLLOW THE STATUTE, CASE LAW AND IGNORED RECORD EVIDENCE IN CALCULATING THE ANTIDUMPING DUTY RATE FOR THE SEPARATE RATE PLAINTIFFS**

A.   **THE STATUTE AND CASE LAW PRECEDENT REQUIRE A REASONABLE SEPARATE RATE**

The Tariff Act of 1930, as amended, provides the following directive regarding the determination of the separate rate:

> (A)  General rule. For purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.

> (B)  Exception. If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

19 U.S.C. § 1673d(c)(5).  Although the statute sets forth an "expected methodology," i.e., averaging the dumping margin for the individually investigated respondents including the zero, de

minimis or adverse facts available ("AFA") rates, it also expressly allows Commerce to use any other method subject to it being "reasonable." Id. The Statement of Administrative Action ("SAA") authorizes Commerce to deviate from applying the expected method if it chooses another "reasonable" method where the expected method results in an antidumping margin that is not feasible or would result in a margin that is not "reasonably reflective of potential dumping margins" for the non-investigated companies. THE URUGUAY ROUND AGREEMENTS ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. REP. No. 103-316 at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.

The courts have elaborated on what is required of Commerce in calculating dumping rates, and the separate rate in particular. "{A}ccuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters." Albemarle Corp. v. United States, 821 F.3d 1345, 1354 (Fed. Cir. 2016); see also Mueller Comercial De Mexico v. United States, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("Commerce must have as its primary objective the calculation of an accurate rate"). "{R}ate determinations for nonmandatory, cooperating separate rate respondents must also bear some relationship to their actual dumping margins." Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1380 (Fed. Cir. 2013). "Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a de minimis and AFA Chinawide rate unreasonable as applied." Id. at 1378 (emphasis added). Further, the requirement in the statute that the method used to calculate the separate rate "be 'reasonable' imposes a duty on Commerce to select a method appropriate for the circumstances." Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1379 (Fed. Cir. 2012). In Bestpak, for example, the U.S. Court of Appeals for the Federal Circuit rejected Commerce's assignment of a separate rate that

3

was "far in excess of the <u>de minimis</u> rate assigned to the only cooperating, non-government controlled, and mandatory respondent" finding the rate was "unjustifiably high and may amount to being punitive, which is not permitted by the statute."  <u>Bestpak</u>, 716 F.3d at 1379; <u>see also</u> <u>Bosun Tools Co. v. United States</u>, __ CIT__, __, 463 F. Supp. 3d 1308, 1318 (2020) (citing <u>Albemarle</u>, 821 F.3d at 1355-57) (concluding that Commerce's application of the "'expected method' of weight-averaging the zero and AFA margins is not reasonable, because Commerce failed to consider evidence indicating that the 41.025 percent rate is not reasonably reflective of the separate rate respondents' dumping."); <u>Godaco Seafood Joint Stock Co. v. United States</u>, Ct. No. 18-00063, 2021 Ct. Intl. Trade LEXIS 4 (Jan. 6, 2021).  Where Commerce seeks to avoid applying the <u>de minimis</u> margin of a mandatory respondent to the separate rate respondents, the burden of establishing that separate rate respondents are not like a <u>de minimis</u> mandatory respondent rests on Commerce.  <u>See</u> <u>Albemarle</u>, 821 F.3d at 1353; <u>Changzhou Hawd Flooring Co.</u> <u>v. United States</u>, 848 F.3d 1006, 1012 (Fed. Cir. 2017).  Commerce has failed to meet its burden in the Final Results.  Commerce has not demonstrated that the separate rate is proper here given that the record evidence shows that it does not yield a separate rate that is reasonably reflective of the separate rate plaintiffs' dumping margins and Commerce also incorrectly concluded that Chengen's zero margin should not be considered representative of the experience of the separate rate plaintiffs.

### B. COMMERCE'S CONCLUSION THAT CHENGEN'S RATE IS NOT RELIABLE IS NOT SUPPORTED BY THE RECORD

As the first basis of support for its 57.36 percent separate rate, Commerce concludes that Chengen's rate would not be reasonably reflective of the estimated dumping margin for the separate rate plaintiffs because Chengen's revised rate of zero was "calculated under protest." Final Results at 13.  Commerce states that it

continues to maintain the position that Chengen's zero percent estimated weighted-average dumping margin is not the appropriate rate to apply to Chengen in this investigation, and that the timing and manner in which Chengen revealed to Commerce how its reported FOPs were calculated warranted Commerce's decision to apply the intermediate input methodology in the Final Determination.

Id. at 12.

In other words, Commerce appears to ignore its own past determinations and the Court's findings with respect to Chengen that

- "Commerce verified the reliability of Linyi Chengen's conversion table and the accuracy of Linyi Chengen's reported factors of production and financial statements based on a review of the record." Chengen III, __ CIT at __, 487 F. Supp. 3d at 1355.

- Commerce "verified the overall accuracy of Linyi Chengen's reported log volumes, including Linyi Chengen's log-to-veneer conversion and reported grade of veneers." Id.

- "After Commerce replaced the obvious typographical errors in the conversion table with the expected sequence, Commerce verified that the formula produced correct results." Id.

- "Commerce determined that the conversion table reflected a correct application of the Chinese National Standard formula to Linyi Chengen's reported log volumes and factors of production." Id.

- "Commerce verified Linyi Chengen's reported factors of production by reviewing numerous business documents placed on the record by Linyi Chengen." Id.

- "Commerce also verified Linyi Chengen's cost of goods sold by confirming consistent audited financial statements and log value accounting." Id.

- "Commerce determined based on its review of the record that Linyi Chengen's log-to-veneer volume conversion was accurate because it reflected Linyi Chengen's core veneer production, which allowed for cracks, holes, stains, and knots, and yielded more veneer per log." Id.

- "Commerce determined that even though Linyi Chengen did not record its grade of veneers consumed, the practice did not give Linyi Chengen any productive benefit because the surrogate value used did not account for grades of veneers." Id.

- "After reviewing Linyi Chengen's factors of production and confirming their accuracy, Commerce determined that Linyi Chengen's reported log volumes represented the accurate volume of logs purchased and consumed by Linyi Chengen." Id.

- "Commerce determined that the facts did not merit a departure from Commerce's normal methodology." Id., __ CIT at __, 487 F. Supp. 3d at 1355-56.

5

Instead of acknowledging this abundant record evidence, Commerce seeks to rehash the issue of Chengen's dumping margin under the guise of the separate rate calculation. Commerce may not ignore the Court's finding "that Commerce supported its determination and application of the chosen methodology by verifying the accuracy of Linyi Chengen's conversion table, reported factors of production with related financial statements, reported log volumes, and relevant log-to-veneer volume conversion" and that given that "Commerce had no questions about the accuracy or validity of Linyi Chengen's factors of production, it was reasonable for Commerce to apply its normal methodology to calculate Linyi Chengen's normal value instead of the intermediate input methodology." Id., __ CIT at __, 487 F. Supp. 3d at 1356. Now that Commerce itself has found that the facts on the record did not warrant use of the intermediate input methodology and the Court has sustained the recalculation of Chengen's dumping margin of zero, Commerce may not decry the reliability of that rate. The fact remains that the only calculated dumping margin on the record is that of Chengen. See Final Results at 13 ("(a) the revised adverse facts available (AFA) rate applied to the China-wide entity (which includes mandatory respondent Shandong Dongfang Bayley Wood Co., Ltd. (Bayley)) of 114.72 percent, and (b) the zero percent rate calculated for Chengen."). Commerce's conclusion in the Final Results that Chengen's highly scrutinized calculated margin of zero is somehow an inferior rate is contrary to the record evidence and is not legally sustainable. Commerce may not avoid the implications of the Court-sanctioned zero margin it has now calculated for Chengen, the only mandatory respondent, by hiding behind the veil of its now discredited dumping calculation. See, e.g., id. at 35 n. 146. Unlike Chengen's dumping margin that has now been verified by Commerce and approved by the Court, the AFA rate used in combination with Chengen's rate to calculate the separate rate is based on information that was not verified, is unreliable and was rejected by Commerce itself.

In its Final Results, Commerce claims that

> the record provides no opportunity for Commerce to know or to calculate the "actual" dumping margins of the Separate Rate Plaintiffs, and, thus, it is not possible for us to determine whether any particular rate is "tethered" (the metric employed by the Court) to the "actual" dumping margins of the Separate Rate Plaintiffs.

Id. at 16.   Commerce also contends that "{b}ecause the separate rate litigants were only required to provide minimal information in their applications for separate rates, Commerce has limited data available to analyze here."   Id. at 20.   And Commerce further states that the cost structure of Chengen was unique in that it produces its own products internally.   See id.   This line of reasoning is flawed for several reasons.

For one, the Court has already held that the incomplete nature of the record cannot be used as a reason to rely on evidence that is not substantiated by actual evidence.

> As noted in Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir. 2013), Commerce creates its own problems when it selects only two mandatory respondents and has minimal information on the record to support its assertions regarding the potential dumping margins of separate rate respondents. Bestpak, 716 F.3d at 1376–79 (citing Yangzhou Bestpak Gifts & Crafts Co. v. United States, 35 CIT 948, 955 n.4 (2011) ("Commerce put itself in a precarious situation when it selected only two mandatory respondents.")

Chengen III, __ CIT at __, 487 F. Supp. 3d at 1358.   The separate rate respondents provided all information requested of them and provided no less information than is required in other cases. Thus, the "lack of information" does not provide a reasonable basis to show that Chengen's rate is somehow unreliable in this particular case.   The alleged shortcomings in record evidence are a result of Commerce's own procedures.

Further, Commerce has not provided an adequate explanation as to why it is reasonable to presume that the separate rate litigants would all universally be selling at a price that is lower than Chengen.   Commerce claims that based on a review of the separate rate applications of the separate rate plaintiffs,

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

> we have determined that the dumping margins alleged in the Petition are representative of the actual selling behavior of separate rate recipients and that additional record evidence distinguishes Chengen's selling behavior during the POI from the selling behavior of the Separate Rate Plaintiffs such that Chengen's rate alone cannot be presumed to be reflective of the estimated weighted-average dumping margin for those companies.

Final Results at 17.  It is true that the separate rate respondents submitted invoices as part of their separate rate application.  See id. at 21.  Commerce does not, however, explain why it presumed that the invoice prices are representative of all types of plywood sold by the separate rate respondents or the pricing of those companies.  Nor could it given that Commerce's separate rate application issued in this investigation asks only for the "first sale by invoice date of merchandise under consideration to an unaffiliated customer in the United States during the POR/POI for a commercial transaction" and not for averaging pricing or any specific type of product.  See generally Letter on Behalf of Chengen to Dep't of Commerce re: Separate Rate App. at 6 (Sec. II, question 4) (Jan. 13, 2017) (Public Version) (P.R. 198) (emphasis added).

In attempting to support the reasonableness of its use of the AFA rate derived from the Petition, Commerce examined the price quotes in the Petition derived from the so-called "Petition SRA Exporter."  Final Results at 15.  Commerce claims that, because the Petition SRA Exporter's pricing is lower than Chengen's, "{t}his means that the likelihood of the products sold by the Petition SRA Exporter being made at dumped prices is significantly greater than at the price sold by Chengen during the POI" thus "indicating that Chengen's zero percent rate would not be representative of the rate applicable to other non-examined separate rate companies in this investigation."  Id. at 19.  By this logic, Chengen's zero percent rate is "representative" of any separate rate litigant selling at prices higher than that of Chengen.  In Attachment I of the Final Results, Commerce lists 40 separate rate exporters covered by this litigation.  Of those exporters, [                              ], had a sale at prices higher than Chengen's unit price average of

[                   ].  See id. at Attach. I- II (Proprietary Document).  Because those [     ] exporters sold at higher prices than Chengen during the investigation, they should be excluded from the antidumping order under the logic used by Commerce.  See id. at 19-20 (Proprietary Document). As a further flaw in its representativeness analysis, Commerce relies solely on [                   ] prices reported by each of the separate rate litigants as a measure of pricing during the investigation rather than, at the very least, using an average of the prices reported by each of the separate rate respondents (where the commercial invoice showed multiple products on the invoice), leading to a clear distortion of the data.  See id. at 22-23, Attach. I (Proprietary Document).

In addition, Commerce's qualms with basing the separate rate on Chengen's zero dumping margin due to concerns that Chengen's cost structure is different from some of the separate rate respondents is also illogical.  Commerce notes that "only 15 out of the 40 exporters self-produced the plywood they sold to the United States during the POI."  Id. at 19.  Commerce then reasons that "{t}here are too many possible, unknown variables in the cost structure of a trader/reseller to definitively state the extent of the operational differences between these 25 separate companies {that sold merchandise manufactured by other companies} involved in this litigation and Chengen." Id. at 20.  Even accepting the premise that the cost structure of a company that sells merchandise produced by other companies is different from a company that self-produces its exported merchandise, in recognizing that 15 out of the 40 separate rate litigants did self-produce merchandise, Commerce is implicitly acknowledging then that 15 out of the 40 separate rate litigants do have a cost structure like Chengen's.  See id. at 22.  Commerce cannot logically have the same concerns about "unknown variables in the cost structure" for those 15 producers, especially those who sold at higher prices than Chengen.  See generally id. at 23 (establishing that there were separate rate litigants who sold at prices higher than Chengen).  There is no reasonable

basis, therefore, to reject the application of Chengen's zero dumping margin to these 15 separate rate respondents on the basis of concerns for cost structure.  At the very least, Commerce must apply Chengen's margin to the [   ] separate rate litigants who had self-produced merchandise and had higher prices than Chengen during the POI according to information summarized by Commerce.  See id. at Attachs. I-II (Proprietary Document).

In response, Commerce claims in the Final Results that "{t}hese lines of reasoning incorrectly presume that Commerce should parse out the separate rate companies into various groups and assign different separate rates to reflect different levels of estimated dumping, rather than, consistent with longstanding practice, treating them as a single group of companies that are entitled to the single rate that is separate from the rate of the government-wide entity."  Id. at 37. Commerce further states that it is not required to corroborate the separate rate.  See id. at 20-21, 37.  Nothing in the statute or precedent, however, allows Commerce to ignore record evidence.  In fact, Commerce must consider the record as a whole, including information that supports and detracts from its conclusions.  See Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984); Seah Steel Vina Corp. v. United States, 950 F.3d 833, 847 (Fed. Cir. 2020) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  Further, as the Federal Circuit has already held in Bestpak, when faced with a zero and AFA margin for the two mandatory respondents, Commerce must determine a separate rate that is accurate and fair, and a constraint on agency resources does not provide relief from this requirement.  See Bestpak, 716 F.3d at 1380.  Here, Commerce ignores this principle, instead speculating that "calculating multiple separate rates would add an unnecessary layer of complexity to the analysis, without necessarily increasing the accuracy of the overall result."  Final Results at 38.  Without actually

performing the analysis, Commerce cannot reasonably conclude that doing so would be "complex" or would not enhance "accuracy."  After all, Commerce itself accepts that "some of the non-examined, separate rate companies involved in this litigation may share a fundamental structural similarly with Chengen." Id. at 24.  Commerce nevertheless discounts this finding by claiming that "there are many other factors that demonstrate, on the whole, that the selling activities, in both prices and products, of the Separate Rate Plaintiffs are dissimilar to Chengen's and indicate that the zero percent estimated weighted-average dumping margin calculated for Chengen is not necessarily representative of the estimated weighted-average dumping margin that would apply to the Separate Rate Plaintiffs."  Id.  As discussed above, however, the record evidence does not support such a determination.

In short, Commerce's attempt to differentiate the experience of the separate rate respondents from that of Chengen is based on suppositions that are both divorced from record evidence and contrary to logic, and Commerce fails to provide a compelling basis for its reliance on the Petition antidumping duty rate, an AFA rate, rather than Chengen's verified data, as discussed further below.  Commerce's separate rate continues to be unsupported by substantial evidence and "untethered" to the actual dumping margins of the separate rate plaintiffs.

C.    USE OF THE CHINA-WIDE ENTITY AFA RATE TO CALCULATE THE SEPARATE RATE IS UNREASONABLE

The lack of reasonableness inherent in Commerce's separate rate calculation is also highlighted by Commerce's use of the AFA margin, derived from the Petition, in the separate rate calculation.  Commerce's incorporation of the AFA rate in the calculation of the separate rate is unreasonable as applied in this case because substantial evidence does not support Commerce's calculation.  In Navneet Publ'ns (India) Ltd. v. United States, __ CIT __, 999 F. Supp. 2d 1354, 1364-65 (2014), the Court rejected a similar attempt by Commerce to average zero margins with

11

an AFA margin to determine the all-others rate.  The Court reasoned that use of the AFA rate was "purposely selected with adversity in mind and constituted but one sale out of many other non-dumped sales." Id., __ CIT at __, 999 F. Supp. 2d at 1364.  Here too, Commerce's use of an AFA rate in the separate rate calculation appears to be aimed at adversity.  The AFA rate of 114.72 percent was the same rate applied to mandatory respondent Bayley, who was found not to be cooperative.  See Final Results at 13.  It is unreasonable to assign fully cooperative separate rate respondents, who have submitted a Q&V questionnaire, completed a separate rate application and responded to any supplemental questionnaires, a dumping margin calculated from the margin assigned to respondents who did absolutely nothing.  Commerce itself has acknowledged that separate rate respondents are different from companies given an AFA rate when it explained that "{e}very company that seeks to qualify for a rate separate from the country-wide entity . . . is required to submit a Separate Rate Application" that "requests various organizational and financial documentation, as well as documentation related to the first sale to an unaffiliated party in the United States."  Id. at 21.

The separate rate companies provided significant information on the record demonstrating their independence from the Chinese government along with actual pricing data that Commerce analyzes elsewhere in the Final Results.  By contrast, the China-wide entity companies did not prove their independence from the Chinese government and did not provide the significant information required by Commerce to prove separate rate eligibility.  Commerce's finding that the separate rate companies were in fact distinct from the China-wide entity makes it unreasonable to apply a separate rate dumping margin that is based on the China-wide rate to those cooperative and fully independent companies.  Commerce's determination to grant some companies separate rate status inexorably delinked the China-wide entity from the cooperating respondents in every

way.  Further, Commerce makes no attempt in its Final Remand to show that Bayley or the China-wide entity is somehow representative of the separate rate plaintiffs.  Commerce may not reasonably conclude on the one hand that Chengen's zero margin is not representative of the separate rate plaintiffs while also concluding that Bayley's rate is sufficiently representative to include in the separate rate calculation with no analysis whatsoever.

Commerce's separate rate calculation finds no refuge in the case law.  No party argues that Commerce is never permitted to average zero and AFA margins.  Cf. id. at 31.  Commerce's reading of the case law ignores the well-tread principles advanced by the Federal Circuit and this Court, as discussed above, that "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters."  Albemarle, 821 F.3d at 1354.  Commerce selectively quotes Bestpak, where the Court did state that the SAA allows Commerce "to factor both de minimis and AFA rates into the calculation methodology," Final Results at 31 (citing Bestpak, 716 F. 3d at 1378), but fails to contend with the part of Bestpak that holds that the method selected by Commerce to calculate the separate rate must be reasonable as applied.  Bestpak, 716 F.3d at 1378.  Commerce's separate rate calculation was not reasonably applied in this case as discussed in the forgoing section and further below.  Commerce also suggests that Navneet and Albemarle are distinguishable because they involved administrative reviews rather than an investigation.  See Final Results at 32.  Commerce does not, however, explain how the difference supports its decision to apply an unreasonable AFA rate to companies that are fully cooperative.  Nor is there any such valid distinction in that the statute and precedent require reasonable, accurate and fair rates regardless of whether a proceeding is a review of investigation.  Indeed, the Federal Circuit has stated on a number of occasions that it is the same statutory provision that applies to the calculation of the separate rate in reviews and investigations.  See Albemarle, 821 F.3d at 1352-

13

53 ("19 U.S.C. § 1673d applies on its face only to investigations, not periodic administrative reviews. But the statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations. … for this reason, Commerce itself has found the statute's methodology applicable in periodic administrative reviews as well as initial investigations" (internal citations omitted)).  These legal arguments in support of the separate rate calculation, therefore, fail.[2]

### D.    THE PETITION ANTIDUMPING DUTY RATE IS DISTORTIVE

A further factor demonstrating that the separate rate assigned by Commerce is not reasonably reflective of the dumping margin of the separate rate plaintiffs is the distortive nature of the AFA rate calculated in the Petition.  In its Final Results, Commerce claims that that the "margins alleged in the Petition are representative of the actual selling behavior of separate rate recipients."  Final Results at 17.  Commerce then notes that the information on the record from Chengen shows that Chengen sold the subject merchandise "at a significantly higher price than the Petition SRA Exporter" and claims that "{t}his means that the likelihood of the products sold by the Petition SRA Exporter being made at dumped prices is significantly greater than at the price sold by Chengen during the POI."  Id. at 19.  Such a results-oriented conclusion cannot lawfully stand.  The selectively provided price quotes included in the Petition are designed to demonstrate high dumping margins.  It is unreasonable for Commerce to support the reliability of such price quotes by arguing that they show high dumping margins.  The fact that Commerce may have a practice of relying on such rates does not make its use in the separate rate calculation "reasonable

---

[2] Although Commerce claims that agency precedent supports its calculation of the separate rate as the average of the zero and AFA rates, Final Results at 32, Commerce has previously applied a zero percent margin to separate rate respondents in such instances.  See, e.g., Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015–2016, 83 Fed. Reg. 35,461 (Dep't of Commerce July 26, 2018).

as applied." Bestpak, 716 F.3d at 1378. The goal of Commerce's separate rate calculation is not to calculate high dumping margins but instead to calculate ones that are accurate and fair. See id. at 1380; Albemarle, 821 F.3d at 1354.

Commerce's attempt to substantiate the AFA rate by comparison to the separate rate application of the Petition SRA Exporter, [                    ], is also flawed. Final Results at 19 (Proprietary Document). Commerce claims that the separate rate application of the Petition SRA Exporter and the Petition price quotes "indicat{e} that Chengen's zero percent rate would not be representative of the rate applicable to other non-examined separate rate companies in this investigation." Id. This conclusion is not supported by logic or substantial evidence. First, the Petition SRA Exporter is [        ] exporter, representing [      ] percent of all sales of subject merchandise during the period of investigation. See Mem. from Amanda Brings to Gary Taverman re: Respondent Selection at Attach. (Jan. 9, 2017) (Proprietary Document) (C.R. 81) (showing total quantity and value of sales for each company). Such a [        ] exporter can hardly somehow be representative of the entire Chinese plywood industry but somehow not be representative of Chengen. In addition to the deficiency of comparison due to the [        ] of the Petition SRA Exporter, Commerce's reliance on the Petition price quote is also based on faulty logic. Commerce claims that "Chengen sold [                    ] at an [        ] price of [          ] USD/m3, which is almost 20 percent higher than the price offered by the Petition SRA Exporter." Final Results at 19 (Proprietary Document). Even accepting that this is true, the fact that the Petition SRA Exporter sold at prices that are 20 percent lower than Chengen does not somehow justify a separate rate of 57.36 percent – far exceeding a 20 percent difference given Chengen's zero dumping margin.

Not only do the price quotes in the Petition lead to a distorted export price, but the normal value in the Petition is also unreliable.   First, the Petition margin uses <u>Thailand</u> as the surrogate country.  <u>See</u> Petition, Vol. II at 10-21 (Public Version) (P.R. 7).   In the final determination, by contrast, Commerce <u>expressly rejected</u> Thailand as an appropriate surrogate country on the basis that Romania provided data that were more specific than those available for Thailand and because of the lack of availability of a Thai contemporaneous financial statement from an integrated producer.  <u>See</u> I&D Mem. at Cmt. 3, p. 30 (P.R. 871).   It is unreasonable for Commerce to rely on the Petition's dumping margin for purposes of calculating the separate rate where normal value is based on surrogate values from a country <u>rejected by Commerce</u>.  The fact remains that the sole calculated margin on the record was based on Romanian surrogate values.   Commerce cannot claim that the use of the AFA rate is reasonable in the separate rate calculation where it is based on surrogate values that the agency itself rejected and where the sole calculated rate using the adopted surrogate country showed no dumping at all.

Second, the dumping rates used in the Petition to calculate the separate rate are distortive because the normal value in the Petition is based on usage rates from a <u>U.S. producer</u>, and not a Chinese company.  <u>See</u> Letter on Behalf of Coalition for Fair Trade in Hardwood Plywood to Dep't of Commerce re: Petitions for the Imposition of Antidumping and Countervailing Duties at Vol. II, at 1 (Nov. 18, 2016) (Public Version) ("Petition") (P.R. 7).   Meanwhile, Commerce had a wealth of information on the record regarding usage rates employed in the Chinese production process from the questionnaire of Chengen.  Given that actual, verified information on usage rates is available on the record, it is unreasonable for Commerce to use a dumping margin from the Petition that is based on secondary, unverified information from a U.S. producer in the separate rate respondents' margin calculation.

Commerce also claims that it "has a longstanding practice of not recalculating petition rates, even where those rates are based on a different surrogate country than that used in the investigation." Final Results at 36 (citing Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 75 Fed. Reg. 41,808 (Dep't of Commerce July 19, 2010), and accompanying Issues & Dec. Mem. at Cmt. 1 ("Narrow Woven Ribbons I&D Mem.")). The case Commerce cites did not examine whether it is reasonable to base a separate rate on AFA derived from the petition where the surrogate country used in the petition was rejected by Commerce. In fact, to the contrary, in Narrow Woven Ribbons, Commerce did indeed recalculate the petition rate for purposes of the final determination. There, Commerce explained that, "{i}n light of the Federal Circuit decision to invalidate the wage rate methodology, the Department has adjusted the petition rate using the surrogate value for labor used in this final determination." Narrow Woven Ribbons I&D Mem. at Cmt. 1. Thus, Commerce's citation to the Narrow Woven Ribbons case is unpersuasive.

Imputing costs from the Petition that Commerce never used, from a totally different surrogate country, and based on costs of a U.S. producer (not Chengen) strains credulity. If, as Commerce contends in the Final Results, differences in cost structure are a valid reason not to apply a mandatory respondent's rate to a separate rate respondent, Final Results at 20, then the Petition margins are by definition totally different than the cost structure of Chengen or any Chinese company. After all, Commerce did not use the normal value methodology from the Petition to calculate Chengen's dumping margin of zero. By Commerce's own reasoning, therefore, it may not rely on the Petition dumping margin in calculating the separate rate given that it is wholly divorced from the cost structure of any Chinese respondent, including Chengen.

The fact remains, that even after yet another remand from this Court, Commerce fails to cite credible economic evidence on the record showing that the separate rate plaintiffs' dumping margins are different than Chengen's zero percent rate or connecting the separate rate plaintiffs' dumping margins with the AFA rate of 114.72 percent.  Cf. Chengen III, __ CIT at __, 487 F. Supp. 3d at 1358-59.  Commerce has failed to "demonstrate{} that Linyi Chengen's 0% dumping margin rate would not be reasonably reflective of the Separate Rate Plaintiffs' potential dumping margins based on substantial evidence."  Id., __ CIT at __, 487 F. Supp. 3d at 1358.  The Court should, therefore, reject Commerce's separate rate calculation and direct Commerce to apply the only reasonably reflective rate on the record, i.e., the zero rate of Chengen.

## II.   TARACA ET AL. JOIN THE COMMENTS BEING FILED BY CHENGEN AND OTHER RESPONDENT PARTIES

Taraca et al. also hereby adopt and incorporate by reference the comments being filed on the Final Results by Chengen and other respondent parties regarding the recalculation of the separate rate.

## CONCLUSION

For the above reasons, the Court must remand Commerce's third remand results once again. Commerce has failed to assign the separate rate plaintiffs a separate rate that is representative of their "actual" dumping margins as the only representative rate on the record is Chengen's zero margin.

Dated: May 3, 2021                          /s/ Jill A. Cramer

                                            Jeffrey S. Grimson
                                            Jill A. Cramer
                                            Mowry & Grimson, PLLC
                                            5335 Wisconsin Ave., NW, Ste. 810
                                            Washington, DC 20015
                                            202.688.3610 (ph)
                                            202.595.8968 (fax)
                                            trade@mowrygrimson.com
                                            *Counsel to Taraca Pacific, Inc., Canusa*
                                            *Wood Products Ltd., Concannon Corp. DBA*
                                            *Concannon Lumber Company, Fabuwood*
                                            *Cabinetry Corporation, Holland Southwest*
                                            *International Inc., Liberty Woods*
                                            *International, Inc., Northwest Hardwoods,*
                                            *Inc., Richmond International Forest*
                                            *Products, LLC and USPly LLC*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jill A. Cramer, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 5,953 words.  This brief thus complies with the Standard Chambers Procedures, which permits briefs of 10,000 words or fewer.


Dated: May 3, 2021

/s/ Jill A. Cramer
Jeffrey S. Grimson
Jill A. Cramer
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
*Counsel to Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC and USPly LLC*