UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| Linyi Chengen Import and Export Co., Ltd <br><br> Plaintiff, <br> and <br><br> Taraca Pacific, Inc., et al., <br><br> Plaintiff-Intervenors, <br> v. <br> United States <br><br> Defendant, <br> and <br><br> Coalition for Fair Trade in Hardwood Plywood <br><br> Defendant-Intervenor. | **PUBLIC VERSION** <br><br> Consol. Ct. No. 18-00002 |

**CONSOLIDATED SEPARATE RATE PLAINTIFFS**[1]**'**
**COMMENTS IN OPPOSITION TO THIRD REMAND REDETERMINATION**

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

Dated: May 3, 2021

---

[1] Consolidated Plaintiffs, Celtic Co., Ltd., Anhui Hoda Wood Co., Ltd., Far East American, Inc., Jiaxing Gsun Import and Export Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. (collectively "Separate Rate Plaintiffs").

## TABLE OF CONTENTS

I.     The Department May Not Lawfully or Reasonably Apply an Adverse Inference Rate to Cooperating Respondents, even in Part, in the Circumstances .......................2

II.    At a Minimum, the Department Should Assign the Voluntary Respondent Plaintiffs Chengen's Zero Margin and Exclude the Companies from the Order .....................11

III.   The Department Should Rely on Xuzhou Jiangyang Wood Industries Co.'s Voluntary Response ........................................................................................................15

IV.    Conclusion .................................................................................................................17

i

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. May 2, 2016) ......................... *passim*

*Changzhou Hawd Flooring Co. v. United States*, 848 F. 3d 1006 (Fed. Cir. 2017).............. *passim*

*Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317   (Ct. Int'l Trade 2018) ............................................................................................................................... 13-14

*Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781 (Fed. Cir. 2020)............. 10-11, 15

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ......................................................................................................................................8

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed. Cir. 2005)...............................................16

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..... *passim*

**Statutes**

19 U.S.C. 1673d(a)(4).................................................................................................................10

**Administrative Decisions**

*Wood Mouldings and Millwork Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 35,900 (June 12, 2020)...........................12

**PUBLIC VERSION**

The Separate Rate Appellants hereby comment on the Department's Third Remand Results. *See* Remand Results (March 22, 2021); ECF 143.  After the Court's opinion in Chengen II, the Department determined to apply the normal methodology and calculated a margin for Chengen of 0.00%.  For the separate rate, the Department simple-averaged Chengen's 0.00% margin and the revised total AFA margin applied to Bayley of 114.72%.  The resulting margin of 57.36% was applied to the SRA Plaintiffs.  The Court properly upheld the Department's calculation of Chengen's 0.00% margin.  Slip-Op 20-183 at 11.  However, the Court remanded the Department's separate rate calculation.  The Court found that the Department failed to demonstrate that Chengen's dumping margin is not reasonably reflective of the SRA Plaintiffs' potential dumping margin.  *Id*. at 14.   The Court remanded the Department's separate rate margin, concluding:

> Commerce cited no credible economic evidence on the record showing that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate or connecting the Separate Rate Plaintiffs' dumping margins with the rate of 57.36% that was derived from the average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%.

*Id*. at 16.

On this third remand, the Department continues to apply a margin of 57.36% to the SRA Plaintiffs.  Despite discussing some additional record documentation, the Department has still failed to point to credible evidence on the record that the SRA Plaintiffs' potential margins are different than Chengen or are somehow connected to Bayley's AFA rate.

Therefore, the Court should find that the Department's calculation of the separate rate is not in accordance with the law and unreasonable on the facts of this record.  The Court should direct the Department that it has failed to support a finding that the SRA Plaintiffs' dumping is different than Chengen, and therefore the only reasonable result is to assign Chengen's margin of

**PUBLIC VERSION**

0.00% to the SRA Plaintiffs.  Further, the Court should agree that in order to give full effect to the 0.00% margin, the Department should also exclude the SRA Plaintiffs from the orders, or at a minimum, exclude the voluntary respondents from the Order.  Alternatively, the Court could also find a reasonable alternative is to calculate a margin based on the full voluntary response placed on the record by Xuzhou Jiangyang Wood Industries Co., Ltd and use that resulting rate in the separate rate calculation assigned to the SRA Plaintiffs.

I.      **The Department May Not Lawfully or Reasonably Apply an Adverse Inference Rate to Cooperating Respondents, even in Part, in the Circumstances.**

The Department continues to simple average Bayley's AFA rate and Chengen's zero rate for the SRA Plaintiffs' margin.  Third Remand Results at 5.  The Department emphasizes that it is not "per se unreasonable" to rely upon an AFA rate and *de minimis* rate for the SRA margin.  *Id*. at 31.  However, while the Department is entitled to rely upon the exception to the "all others" calculation method in the statute based on "any reasonable method," the Department's method was <u>not</u> "reasonable" because it was not supported by substantial evidence nor was it in compliance with this Court's remand or other court precedents.

In the second remand, the Department attempted to argue that this margin was reasonably reflective of the SRA Plaintiff's potential dumping because of the dumping margin alleged in the petition which was based on a single company's price quotes.  SRA Plaintiffs demonstrated that the Department has long since found price quotes are not a reliable basis for a surrogate value, and therefore certainly cannot reasonably be the basis of determining potential margins of all the separate rate companies.  SRA 2nd Remand Comments (August 3, 2020) at 6-7; ECF 118.  The Court found this Petition data was untethered from any actual dumping margins and found that this was not credible economic evidence on the record that the SRA's dumping behavior was

different than Chengen or similar to the SRA margin.  Slip-Op 20-183 at 15-16.  In this third remand, the Department has still not cited to credible economic evidence for this purpose with any connection to an actual dumping margin that suggests the SRA Plaintiffs dumping is different than Chengen or represented by the AFA Bayley margin.

The Department again attempts to use the price quotes from the Petition, endeavoring to tie them to the investigation using the company' single commercial invoice filed with its separate rate application in the investigation.  Third Remand Results at 16-17.  The Department reasons that because this so named "Petition SRA Exporter's" price in a commercial invoice on the actual record of the investigation is almost identical to the price quote in the Petition, this justifies the reasonableness of the Petition rates.  However, this still does not address that the Petition rates were based on pricing data from an entirely different surrogate country than relied upon in the investigation.  Further, the Petition's underlying factor data is based on estimates rather than the factor data collected in the course of the investigation, which is a company's own factor valuation data collected and examined extensively through numerous questionnaires.  Hypocritically, the Department claims its cannot calculate and rely upon a margin from Jiangyang Wood's questionnaire data, detailed actual cost and sale data from the POI, because it was only initial questionnaire data without the benefit of the Department's further inquiry through supplemental questionnaires, yet the Department finds it can rely on estimated cost data from the Petition and price quotes.  Third Remand Results at 44.

The Petition margin is highly speculative and not based on any company's actual data under investigation or even on the selected surrogate country. No matter the price on a single commercial invoice that is included in the Petition SRA Exporter's separate rate application, or the price on any SRA plaintiff's single commercial invoice submitted with their own SRA, it has

PUBLIC VERSION

no rational bearing on the representativeness of the Petition margin.  The Petition margin is
based on estimates to reach the basic determination that plywood from China may be dumped,
such that the investigation should be initiated.  During the investigation, the Department
collected actual verified data on the full period of investigation cost of production and sales to
the United States and determined an actual dumping margin based on that robust and
representative data.

Second, the Department compares the Petition SRA Exporter's single commercial
invoice price and the other SRA companies' single commercial invoice prices to Chengen's
pricing data.  Third Remand Results at 16-22.  In the separate rate application, each company
must file the commercial sales package from their first sale during the POI.  From this limited
information, the Department has made price comparisons to Chengen's sales prices and finds
that because some SRA companies had a lower sales price on the single invoice from their first
POI sale, this supports a finding that their dumping is different than Chengen.  *Id*.  Even looking
at this data as compiled by the Department, numerous SRA companies had sales prices in range
or higher than Chengen's sales prices.  *Id*. Attachment 1.  Therefore, this supposed evidence does
not support the Department's conclusion to justify the high SRA Plaintiff margin.  Further, even
if some companies had a lower sales price than Chengen on one sale, this does not entail that the
margin of 57.36 percent is reasonably reflective of their potential dumping rather than Chengen's
0 percent margin.  Indeed, the Department cites to birch plywood (same material as Chengen's
plywood) sales invoices in the SRA companies' applications ranging from [

] compared to Chengen's lowest selling price of [                    ].  Third Remand Results
at 20.  Even taking only the companies with sales prices' lower than Chengen, the prices are not
so much lower as to justify the increase from 0% to 57.36%.  This comparison is still not

PUBLIC VERSION

"credible economic evidence" that the SRA companies' dumping would be remotely represented by the 57.36% margin.

Further, this analysis generally fails to comprehend the limited scope of this analysis. The presence of a single sale with a lower price than Chengen's lowest sales price does not indicate the company would be dumping overall, especially at 57.36%. Chengen's sales prices ranged from [                    ], with a weighted-average price of [                ]. *See* Chengen Supp. Qre (May 15, 2017) at Exhibit SQ6-1 (revised U.S. Sales Database); CD493 PD623. The record also contains the full U.S. sales database from Bayley and Jiangyang Wood. While the Department ultimately applied total AFA to Bayley, that determination did not undermine its own U.S. sales data. Bayley's sales prices ranged from [                    ], with a weighted-average price of [                ]. Bayley Section C Qre (February 28, 2017) at Exhibit C-1; CD269 PD344. Jiangyang Wood's sales prices ranged from [                    ], with a weighted-average price of [                ]. Jiangyang Wood Section C Qre (February 28, 2017) at Exhibit C-1; CD289 PD351. These two other companies' sales databases on the record, one of which, Jiangyang Wood, is an SRA Plaintiff, show that other companies actually had a [      ] average sales price than Chengen. Also, the Petition SRA Exporter, the basis of the Department initial pricing comparisons actually had two sales of birch plywood in its sales package in the separate rate application. The first had a price of [                ] and the second had a price of [                ]. Petition SRA Exporter SRA (January 17, 2017) at Exhibit 1; CD195 PD247. Thus, the record overall, even the metrics raised by the Department, does not support its conclusion that the SRA companies' pricing is different than Chengen's pricing or that these companies are dumping at such dramatically higher levels than Chengen – i.e. 0% compared to 57.36%.

**PUBLIC VERSION**

The Department also discusses that Chengen purchased plywood from a related producer, while some SRA companies similarly purchased from related producers, but other SRA companies self-produced or purchased from unaffiliated producers. Third Remand Results at 17-18. However, there is no evidence that merely having a different purchasing structure would render a margin based in part on Bayley's total AFA margin that would somehow be more reflective of these cooperative companies' dumping. This is not "credible economic evidence." Indeed, the Department attempts to grasp at any difference with Chengen to substantiate its position, but fails to acknowledge the presumption raised by the Court that Chengen's cooperating calculated rate that was fully developed and investigated is most comparable to coopering SRA companies.

The Department also appears to infer that the fact that Chengen's revised rate of zero was calculated "under protest," entails that Chengen's margin is not accurate and reflective of the SRA Plaintiffs. Third Remand Results at 12. As an initial matter, the Court did not force the Department to calculate a zero margin for Chengen. The Court found that the Department's justification for not applying the normal methodology was not supported by the record and practice. After reconsidering the full record, the Department found it no longer had grounds to apply the intermediate methodology. Regardless, whether or not "under protest," Chengen's margin was calculated by the Department based upon Chengen's books and records. It is an accurate calculated margin that is applicable to Chengen. The Court has upheld this 0.00% margin. Therefore, the Department has no legal basis to find this margin is inaccurate and assign such unsupported presumption to the SRA plaintiffs.

Ultimately, throughout the remand, the Department continually faulted the lack of information on the record to determine whether or not Chengen's dumping margin is reasonably

**PUBLIC VERSION**

reflective of the SRA Plaintiff's potential margin.  Indeed, in response to the parties' comments on the draft remand, the Department again reiterated the "limited" record evidence available to corroborate the SRA margin.  Third Remand Results at 32-35.  However, as already briefed before the Department and Court, this lack of information is of the Department's own making. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1380 (Fed. Cir. 2013) ("*Bestpak*")at 1380 (noting the Department was certainly aware early in the proceeding that one of the respondents was not responding and "could have gathered more information.").  The Department refused to continue to investigate Bayley, which argued extensively before the agency and Courts for the Department to continue its investigation and calculate a margin.  The Department refused to investigate the companies that requested to be voluntary respondents and filed their own data on the record.  Further, the Court properly found that the presumption is that Chengen's margin, as the only actually calculated margin and the only cooperating margin calculated, is representative of the SRA Plaintiffs.  Therefore, the lack of information to the contrary only entails that Chengen's margin is representative and should be applied to the SRA Plaintiffs.

Lastly, the Department's remand does not address the overarching issue that applying a non-contemporaneous total AFA margin to the cooperating mandatory respondents is unreasonable and not reflective of their potential dumping.  The SRA Plaintiffs directs the Court to its argument on this point already raised before the agency and the Court, but also reiterates here that the AFA rate is not representative.  SRA Plaintiffs 2nd Draft Remand Comments (May 4, 2020) at 2-9 Rem. PD30; SRA Plaintiffs Remand Comments (August 3, 2020) at 1-12 ECF 118.

PUBLIC VERSION

The Court of Appeals has addressed, by overturning, this very scenario wherein one of two mandatory respondents was assigned total AFA and the other was assigned a *de minimis* rate and the Department averaged the two rates, asserting that was a reasonable method.  *See Bestpak*. The *Bestpak* Court held that it was unreasonable to ascribe to cooperating exporters found to be separate from the Chinese State any rate assigned to such a state-controlled entity.  The Department is averaging a total adverse facts rate and a *de minimis* rate for fully cooperating respondents in contravention of the clear holding of *Bestpak*.

In *Bestpak*, after acknowledging that the law technically allows the Department to simple average rates and even include total AFA PRC Entity rates in the separate rate, the Court found that the particular circumstances in *Bestpak* rendered the Department's calculation *unreasonable*:

> Nevertheless, "[w]hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case." *Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1085 (Fed. Cir. 2001)*. "[F]orm should be disregarded for substance and the emphasis should be on economic reality." *United States v. Eurodif S.A., 555 U.S. 305, 317-18, 129 S. Ct. 878, 172 L. Ed. 2d 679 (2009)*. This court finds that this case presents that situation. Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

*Bestpak* at 1378.  The panel found the evidentiary support for the Department's methodology—attributing the theoretical adverse AD rate of the PRC Entity to the cooperating separate rate exporters—severely lacking:

> This court does not find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence. Commerce only received detailed information from one mandatory respondent: Yama. Jintian's estimated AUV, with little

> connection to its calculated dumping margin, is not enough. In other words,
> Commerce really only had one substantiated and calculated basis for dumping
> margins and that information came from Yama. Commerce cannot base a
> determination of economic reality on such slim findings. There must be more.

*Bestpak* at 1379; *See also Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012) ("applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute. Commerce misses the point when it argues that the appellant cannot complain because it does not bear an AFA rate directly, but only a separate rate derived from the AFA rate, which is only half as adverse.  Although the hypothetical AFA rate was not *directly* applied to a cooperating respondent, cooperating respondents were the *only* entities impacted by the recalculated rate."*)*.  The Department has detailed AD margin calculations for one Chinese exporter and an AFA rate for the PRC Entity. Under these facts, the Court should find that the Department has no legal or factual basis to average the PRC Entity rate with Chengen's rate in assigning the separate rate in this investigation.

In *Changzhou Hawd*, drawing on *Albemarle*, the Court held that the mandatory respondents are assumed representative of the cooperating exporters unless substantial evidence shows otherwise.  *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. Feb. 15, 2017).  The Court went on to observe that the record not only contained no information to suggest the separate rate firms were not similar to the cooperating respondents, and in fact, the only reasonable way to construe the record was to support a finding that cooperating respondents are similar to the cooperating respondent.  *Changzhou Hawd*, 848 F.3d at 1012 (Indeed, under Commerce's reasoning, the separate-rate firms' decisions to respond to the questionnaires might suggest that they are more similar to other firms, like the mandatory

respondents, that responded.").  The separate rate companies have responded to all inquiries made by the Department.  They have established they are separate from the Chinese Government.  They have fully cooperated.  Following court precedents and the premise of the statutory provision for limiting individual review, the Court should find that the Department must now assume that these separate rate companies' pricing behavior is similar to the pricing behavior of the cooperating respondent, Chengen.  Accordingly, the Court should find the only reasonable result now, after failing to justify an alternative on remand, is for the Department to assign the separate rate companies the margin assigned to Chengen in the remand, i.e., a zero margin.

The SRA Plaintiffs also submit that the only reasonable, fair way to give effect to a zero margin is for the Department to also exclude the SRA Plaintiffs from the Order pursuant to 19 U.S.C. 1673d(a)(4).  The CAFC did find that the Department's position in the antidumping investigation of *Wood Flooring from China* not to exclude SRA companies receiving a zero margin from the Order was a reasonable interpretation of the law.  *Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 792-793 (Fed. Cir. 2020).  However, the CAFC did not find that was the only reasonable interpretation of the law—i.e. it is not mandated in non-market economy[2] reviews that SRA companies receiving a *de minimis* margin must remain subject to the Order. Under the particular circumstances of this case, it is only reasonable to exclude the SRA Plaintiffs from the Order in this investigation.  There is no evidence of dumping in this review.  The only potential above *de minimis* margin the Department could calculate are

---

[2] In market economy reviews, when the mandatory respondent received a de minimis margin, the entire decision is negative and there is no Order—i.e. the all-others rate companies receive the full benefit of the mandatory respondents' de minimis margin.

fictitious adverse margins based on the Petition, and therefore would not be based on any company's actual data under investigation or even on the selected surrogate country. Given the lack of any actual evidence of dumping, the Court should find it is unreasonable to effectively penalize the cooperating SRA Plaintiffs with the PRC-entity's assumed dumping by keeping the SRA Plaintiffs in the Order merely for the sake of the Department's lack of resources to individually review all the SRA companies or its choice to stop investigating another mandatory respondent and not replace them after declaring early in the investigation that this other respondent could not cooperate. Therefore, the Court should also order the Department to exclude the SRA Plaintiffs from the Order.

## II.   At a Minimum, the Department Should Assign the Voluntary Respondent Plaintiffs Chengen's Zero Margin and Exclude the Companies from the Order.

In the investigation, Xuzhou Jiangyang Wood Industries Co., Ltd ("Jiangyang Wood"), Linyi Sanfortune Wood Co., Ltd ("Linyi Sanfortune"), and Xuzhou Longyuan Wood Industry Co., Ltd ("Longyuan Wood") each requested to be selected as a mandatory respondent or, in the alternative, requested that the Department accept them as a voluntary respondent. *See* Jiangyang Wood Request (December 9, 2016) PD42; Linyi Sanfortune Wood Request (December 9, 2016) PD43; Longyuan Wood Request (December 9, 2016) PD44. The Department found that because of the large number of producer and exporters, it was unreasonable to examine each known company and instead selected only two mandatory respondents. *See* Respondent Selection Memo at 2-5; CD81 PD148. In response to the requests to be a voluntary respondent, the Department merely noted the requests and said the Department would consider at a later time whether to examine a voluntary respondent. *Id*. at 7. Jiangyang Wood also timely filed

responses to the Section A, C, and D questionnaire responses.  *See* Dep't Voluntary Resp. Memo

(April 4, 2017) at 1; PD451.

    For all the reasons discussed above for the SRA Plaintiffs generally, these companies are

not similar to Bayley but are similar to Chengen.  Moreover, for the additional reason of

specifically requesting that the Department review them, these Voluntary Respondent Plaintiffs

have further demonstrated their similarity to Chengen.  The companies requested that the

Department review their own data, confident that based on their own production costs and sales

data, they were not dumping.  The Department cannot presume any potential of unfair trading for

the companies that requested voluntary treatment and must assign them a zero margin.  The

Court has taken issue with the Department's refusal to select voluntary respondents, even finding

in *Changzhou Hawd*, discussed further below, that such companies should be treated differently

than other SRA Plaintiffs, concluding that companies which request to be voluntary respondents

did so with the expectation that they receive a lower margin than the mandatory respondent.

    Ultimately in this investigation, the Department determined not to select "any voluntary

respondents because selecting any additional company for individual examination would be

unduly burdensome and will inhibit the timely completion of this investigation."  *Id*. at 2.

Indeed, the Department essentially has a policy of never accepting voluntary respondents.[3]  The

---

[3] For example, in the countervailing investigation of *Wood Mouldings from China*, the Department
initially selected two mandatory respondents.  Very early on in the proceeding before any questionnaire
responses were due, one of the companies stated their intent not to participate leaving the Department
with only one respondent in the investigation.  Bel Trade, a company not selected as a mandatory
respondent, made several requests to be selected as a mandatory or voluntary respondent in the
countervailing investigation.  Bel Trade was selected as a mandatory in the companion antidumping
investigation.  Bel Trade timely filed its affiliation and section III questionnaire responses.  Bel Trade also
reported necessary information to the GOC and the GOC filed its initial questionnaire response with all
necessary information concerning Bel Trade and the mandatory respondent.  Despite having all
information required from Bel Trade and the GOC, the Department chose not to accept Bel Trade as a
voluntary respondent and is continuing the investigation with only one mandatory respondent.  The

PUBLIC VERSION

Department continually selects limited respondents and refuses to accept voluntary respondents even after companies supply extensive questionnaire data.  Then, in a circumstance such as this case, where one of these limited respondents receives a *de minimis* margin and the other receives total AFA, the separate rate companies are penalized by the inclusion of this AFA rate either in their own margin or in requiring the companies to remain subject to the Order despite no actual evidence of dumping.

Recognizing the unfairness of the Department "reject[ing] all voluntary examination requests, foreclosing any path to exclusion for respondents seeking an individual weighted average margin," in the appeal of the investigation of *Multilayered Wood Flooring from China*, the Court ordered the Department to exclude all companies that requested voluntary treatment from the Order when properly assigned the cooperating respondents' zero margin.  *Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317, 1326-1328 (Ct. Int'l Trade 2018).

The Court did not require that the voluntary respondents had to have appealed the respondent selection issue for this issue to be before the Court, but found

> the Voluntary Applicants may nevertheless challenge Commerce's separate and distinct decision denying them exclusion from the Order. That determination (like many Commerce determinations), just happens to comprise numerous other decisions Commerce made through the course of the proceeding: mandatory respondent selection, treatment of voluntary examination requests, the calculation of each of the mandatory respondents' margins, and the calculation of the separate rate, among others. Commerce's determination that resource constraints precluded voluntary examinations may itself have been reasonable. Having made that

---

Department had not expended any resources already on the company that withdrew participation.  The Department had not missed any time given the timely submission of the questionnaires and the early stages of the investigation.  However, the Department still determined, before even issuing supplemental questionnaires, that it would be "unduly burdensome and inhibit the timely completion of this investigation" to select a voluntary respondent.  The Department had initially selected two respondents and claimed it had the resources to investigate two respondents.  The Department's decision to not select and investigation Bel Trade as a secondary respondent underscores the Department essential policy that it will not accept a voluntary respondent under any reasonable circumstance.

decision, Commerce's subsequent decision to refuse to exclude Voluntary Applicants assigned a zero percent margin is not.

*Changzhou Hawd*, 324 F. Supp. 3d at 1327.  Notably,  Court also found this logic applies to all companies that underlined(requested) to be selected as voluntary respondents, not limiting its consideration to only companies that also supplied voluntary questionnaire response.  The Department raises that only Dehua and Jiangyang timely filed voluntary questionnaire responses, however the Changzhou Hawd Court did not find this additional step was even necessary to be considered a voluntary respondent for exclusion from the Order.  Third Remand Results at 42.  The Court concluded the Department acted unreasonably and arbitrarily:

> The court believes Commerce's application of its exclusion regulation to the Voluntary Applicants it assigned "representative" zero percent margins has two insurmountable problems. The first is Commerce's refusal to conduct any voluntary examinations, preventing the Voluntary Applicants from demonstrating directly their own evidence of fair trading. The second is Commerce's continuing assumption or inference that Voluntary Applicants denied individual examination and ultimately assigned a "representative" zero percent margin were nevertheless unfairly trading, precluding exclusion. The court questions how a reasonable mind could maintain such an assumption or inference against the Voluntary Applicants.
> …
> the court believes the proper remedy is entry of judgment declaring Commerce's failure to exclude the Voluntary Applicants arbitrary, and directing Commerce to exclude them from the Order ab initio.

*Id*. at 1327-1328.

The Department did not challenge and appeal the Court's opinion that the Department must exclude the voluntary applicants.  The Petitioner challenged this decision to the CAFC; however, the CAFC found "no reversible error in the Trade Court's conclusion that Commerce did not provide an adequate justification for including the voluntary-review firms in the antidumping duty order in this case." *Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 794 (Fed. Cir. 2020).  While the CAFC left open that the Department could address "any

justification Commerce might yet articulate for deciding to include voluntary-review firms in an antidumping-duty order," the Department has failed to address the serious unfairness, unreasonableness, and arbitrary nature of not excluding voluntary applicants as raised by the lower Court and quoted above.  The Court should conclude that given the Department itself limited respondent selection and refused to accept any voluntary respondents, at a minimum the Department cannot presume any potential of unfair trading for the companies that requested voluntary treatment and must assign them a zero margin and exclude them—Jiangyang Wood, Linyi Sanfortune, and Xuzhou Longyuan (among the SRA Plaintiffs)—from the Order consistent with *Changzhou Hawd*.

## III.     The Department Should Rely on Xuzhou Jiangyang Wood Industries Co.'s Voluntary Response.

The Department attempts to glean information to support the SRA margin from the Petition and the limited information available in companies' separate rate applications. However, the record contains the complete questionnaire responses from Jiangyang Wood. Jiangyang Wood requested to be a voluntary respondent and then timely filed responses to the Section A, C, and D questionnaire responses.  *See* Dep't Voluntary Resp. Memo (April 4, 2017) at 1; PD451.  As discussed above, the Department has a pattern of limiting respondent selection, refusing to select voluntary respondents, and then due to the limited respondent selection, encounters issues calculating the separate rate margin.  In this case, the Department limited themselves to only two mandatory respondents, despite Jiangyang Wood requesting to be a voluntary respondent and submitting complete questionnaire responses to the record.  Even when the Department determined to apply AFA to Bayley, a fact that become evident prior to the Preliminary Determination, the Department continued to refuse to select an additional

respondent.  In the Preliminary Determination, and again now on Remand, the Department was

unable to follow the normal method for calculating the separate rate because the only margins

calculated were *de minimis* and total AFA.  This difficulty was of the Department's own making

in limiting respondent selection in the first place, and even more so as the investigation

continued and the potential for one margin to be an AFA margin became certain.

Jiangyang Wood has especially been prejudiced as it underwent the great effort to place

its full data on the record and requested that the Department review its data and calculate its own

margin.  The record contains all information required by the Department to calculate a margin

for Jiangyang Wood, but instead Jiangyang Wood has been assigned a margin bearing no

connection to its own data that is based half on a total AFA margin from the Petition.

The *Bestpak* Court chastised the Department, observing that the dearth of data concerning

individual margins for cooperating exporters was a problem of the Department's own making

when it limited the mandatory respondent pool to so few respondents.  *Bestpak* at 1380.  The

Court noted that the Department was "certainly aware of this situation when Jintian was being

unresponsive early in the investigation and could have gathered more information."  *Id*.  While

the Department argued "in its Final Remand Results that it was the best it could do because of

the limited record, this court finds no support in this court's precedents or the statute's plain text

for the proposition that limited resources or statutory time constraints can override fairness or

accuracy."  *Id*. c*iting SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005).

Indeed, in *Bestpak*, the Court ordered the Department to individually review the separate

rate appellant upon remand, which is precisely what Jiangyang Wood asked the Department to

do *during the course of* the investigation.  *Bestpak* at 1380. The Department claims it cannot rely

upon Jiangyang Wood's information because it is only initial questionnaire data and has not been

PUBLIC VERSION

"vetted for accuracy in order to assure that the data upon which our calculations are based is complete and accurate." Third Remand Results at 44. Of course, the questionnaires were on the record from the deadline set for the mandatory respondents to submit their questionnaire data, parties had a full opportunity to consider their data and submit deficiency comments and the Department had the opportunity to issue supplemental questionnaires. The Department notes that it did not have the resources to do so during the investigation, yet again, the Department is penalizing cooperating companies with its own lack of resources. Third Remand Results at 45-46. Further, as noted above, the questionnaire data provided by Jiangyang Wood is significantly more accurate and able to be vetted than the hypothetical, estimated data the Department is relying upon from the Petition. The hypothetical Petition data was certainly not "subject to the same processes and standards that Commerce employs" to calculate dumping margins from mandatory respondents. Third Remand Results at 45.

The Department's reasoning that it cannot rely upon Jiangyang Wood's extensive questionnaire data is wholly implausible given the Department is relying upon data from the Petition. Accordingly, if the Court does not order the Department to apply Chengen's 0.00% margin to Jiangyang Wood, the Court should order the Department to calculate a margin for Jiangyang Wood based on its existing voluntary responses and the surrogate data on the record.

## IV.   Conclusion

Based on the foregoing, the Court should order the Department to only apply the rate individually calculated for the cooperating exporter deemed separate from the Chinese State Entity, i.e, Chengen, to the rates for other exporters deemed separate from the Chinese State Entity, i.e. the SRA Plaintiffs. The Court should also instruct the Department to assign the voluntary applicants, Jiangyang Wood, Linyi Sanfortune, and Xuzhou Longyuan, Chengen's

17

**PUBLIC VERSION**

zero margin and exclude them from the Order.  Alternatively, the Court could instruct the

Department to use the voluntary questionnaire data and surrogate value data on the record to

calculate a margin for Jiangyang Wood.

                            Respectfully submitted,

                            /s/ Gregory S. Menegaz
                           Gregory S. Menegaz
                           J. Kevin Horgan
                           Alexandra H. Salzman*
                           **DEKIEFFER & HORGAN, PLLC**
                           Suite 410
                           1090 Vermont Ave., N.W.  20005
                           Tel: (202) 783-6900
                           email:  gmenegaz@dhlaw.com

                           * Admitted to California Bar; practice supervised
                           by attorneys of the firm who are active D.C. Bar
                           members pursuant to D.C. Bar Rule 49(c)(8).

Date: May 3, 2021

**<u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 5,500 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DeKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.
Washington, D.C. 20005
*Counsel to Plaintiff*