UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| Linyi Chengen Import and Export Co., Ltd )<br><br>Plaintiff, )<br>and )<br><br>Taraca Pacific, Inc., et al., )<br><br>Plaintiff-Intervenors, )<br>v. )<br>United States )<br>Defendant, )<br>and )<br><br>Coalition for Fair Trade in Hardwood Plywood )<br><br>Defendant-Intervenor. )<br> ) | **PUBLIC VERSION**<br><br>Consol. Ct. No. 18-00002 |

<u>CONSOLIDATED SEPARATE RATE PLAINTIFFS[1]'</u>
<u>COMMENTS IN OPPOSITION TO FOURTH REMAND REDETERMINATION</u>

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
de**K**ieffer & **H**organ, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

Dated: December 29, 2021

---

[1] Consolidated Plaintiffs, Celtic Co., Ltd., Anhui Hoda Wood Co., Ltd., Far East American, Inc., Jiaxing Gsun Import and Export Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. (collectively "Separate Rate Plaintiffs").

**TABLE OF CONTENTS**

I.     **The Department Has Failed to Calculate a Margin that is Reasonably Reflective of the SRA Plaintiffs' Potential Dumping Margin.** ............................................................2

II.    **The Court Must Order the Department to Recalculate the Separate Rate Plaintiff's Margin and the Voluntary Respondents' Margin** ......................................................11

III.   **Conclusion** ....................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)............................................4

*Changzhou Hawd Flooring Co. v. United States*, 848 F. 3d 1006 (Fed. Cir. 2017)............... 10-11

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) .............................................4

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)....................................................7

**Statute**

19 U.S.C. 1677b(c)(1)........................................................................................................................6

The Separate Rate Appellants hereby comment on the Department's Fourth Remand Results. *See* Remand Results (November 10, 2021); ECF 205. After the Court's opinion in Chengen II, the Department determined to apply the normal methodology and calculated a margin for Chengen of 0.00%. For the separate rate, the Department simple-averaged Chengen's 0.00% margin and the revised total AFA margin applied to Bayley of 114.72%. The resulting margin of 57.36% was applied to the SRA Plaintiffs. The Court properly upheld the Department's calculation of Chengen's 0.00% margin. Slip-Op 20-183 at 11. However, the Court has now remanded twice the Department's separate rate calculation. In Chengen III, the Court found that the Department failed to demonstrate that Chengen's dumping margin is not reasonably reflective of the SRA Plaintiffs' potential dumping margin and remanded the Department's separate rate margin, concluding:

> Commerce cited no credible economic evidence on the record showing that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate or connecting the Separate Rate Plaintiffs' dumping margins with the rate of 57.36% that was derived from the average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%.

*Id*. at 16.

Nonetheless, on the third remand, the Department continued to apply the 57.36% to the SRA Plaintiffs. The Court again considered the Department's reasoning and the parties' comments on the separate rate margin and again found that the Department has not justified its reliance on the 57.36% margin for the cooperating separate rate Plaintiffs:

> Commerce must support with substantial evidence its application of a 57.36% all-others separate rate. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). The Court notes Commerce's acknowledgment that the record provides no opportunity for Commerce to know or to calculate the actual dumping margins of the Separate Rate Plaintiffs. *See* Third Remand Determination at 16. Nonetheless, Commerce is still required to assign dumping margins as accurately as possible. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Commerce

1

created its own problems when it selected only two mandatory respondents, which resulted in sparse information on the record to support its assertions regarding the potential dumping margins of the separate rate respondents. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1376–79 (Fed. Cir. 2013) (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 35 CIT 948, 955 n.4 (2011) ("Commerce put itself in a precarious situation when it selected only two mandatory respondents.")). Because Commerce cited as record evidence only one commercial invoice showing an approximately 20% price difference, the Court concludes that Commerce's 57.36% separate rate assigned to the voluntary, cooperating Separate Rate Plaintiffs is not reasonable and is unsupported by substantial evidence.

Slip Op. 21-127 at 18.

On this fourth remand, the Department continues to apply a margin of 57.36% to the SRA Plaintiffs adding no meaningful consideration of the Court's instructions. The Department has still failed to point to credible evidence on the record that the SRA Plaintiffs' potential margins are significantly higher or dissimilar than Chengen or are somehow connected to Bayley's AFA rate. Therefore, the Department's calculation of the separate rate is not in accordance with the law and unreasonable on the facts of this record. The Department must assign the SRA Plaintiffs a margin that is reasonably reflective of their potential dumping margins.

## I.     The Department Has Failed to Calculate a Margin that is Reasonably Reflective of the SRA Plaintiffs' Potential Dumping Margin.

The Court had previously found that the Petition data price quote was untethered from any actual dumping margins and found that this was not credible economic evidence on the record that the SRA's dumping behavior was different than Chengen or similar to the SRA margin. Slip-Op 20-183 at 15-16. In the third remand, the Department attempted to "tether" it by demonstrating that the so named "Petition SRA Exporter's" price in a commercial invoice on the actual record of the investigation (filed in the Separate Rate Application) is almost identical

to the price quote in the Petition, this justifies the reasonableness of the Petition rates. As quoted above, in the last remand the Court found that a single commercial invoice from the Petition SRA Exporter demonstrating a price 20% lower than Chengen's prices is not substantial evidence to support assigning the SRA Plaintiffs a margin of 57.36%. Now, in the fourth remand, the Department attempts to further corroborate the Petition rate as a reasonable estimate of dumping for the SRA Plaintiffs by looking at additional invoices in a supplemental SRA questionnaire from the Petition SRA Exporter. Fourth Remand at 31-32. However, these invoices were for the company's own purchases of plywood in China from its own suppliers, and not additional sales of subject merchandise to the United States. The fact that the Petition SRA Exporter bought plywood in China for [    ] USD/M3 is not relevant to the inquiry of its U.S. sales price; the company actually sold that product for [    ] USD/M3. Fourth Remand at 32. Moreover, the [    ] USD/M3 invoice was not the only invoice of [

] in the supplemental questionnaire. The Petition SRA Exporter sold the same plywood for [            ] USD/M3. Petition SRA Exporter Supplemental SRA at [

]; [            ].

Ultimately, the only evidence the Department has proffered to support its margin is that the Petition SRA Exporter had a sale of subject merchandise for [    ] USD/M3 and [    ] USD/M3 during the POI---compared to Chengen's sales of a similar product for [    ] USD/M3[2]. Which, as already said, ignores other record evidence from the very same company

---

[2] This figure used for comparison by the Department was only for [                        ] that was similar to the product sold to by the Petition SRA Exporter . Chengen's sales prices for all subject merchandise ranged from [            ]. *See* Chengen Supp. Qre (May 15, 2017) at Exhibit SQ6-1 (revised U.S. Sales Database); **CR493, 497, PR623**. Likewise, as discussed further below, this Petition SRA Exporter sold other subject merchandise at prices **higher** than Chengen as well.

for the same company.  From this, the Department takes the dramatic and unsupported leap that the record "indicates that separate rate companies had potential dumping margins during the POI at levels of the highest petition rate of 114.72."    Fourth Remand at 11.

This analysis ignores several key record facts that Commerce continues to fail to consider.  When considering the record as a whole, the determination that a 114.72% margin, much less a 57.36% margin, is representative of the SRA Plaintiffs potential dumping is not supported by substantial evidence.  Instead, the Department has ignored record evidence.  "[S]ubstantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487).

First, the Department fails to consider Chengen's actual negative margin.  The Petition price quote (and SRA commercial invoice) is only 20 percent lower than Chengen's prices for a similar product.  Not only does this <u>not</u> justify the leap to a 57.36% margin from a zero margin, it fails to consider that Chengen's actual margin was not 0%; it was merely reported at zero by convention. Chengen's margin is actually much lower at [          ]%[3].  Even adjusting Chengen's

---

[3] Chengen's total sales value $[          ] divided by Chengen's PUDD [          ] equals [          ]%.  *See* Second Remand Results Analysis Memorandum (June 18, 2020); **2ⁿᵈ Rem. CR1, 2ⁿᵈ Rem. PR17**.

sales prices to be 20% lower, the margin would still be steeply negative, at [      ]%[4].

Therefore, regardless of the information the Department cites to supposedly corroborate the

Petition SRA Exporter's price quotation in the Petition (only 20% lower than Chengen's price),

it does not support the application of the 57.36% margin to SRA companies.

Second, throughout the remand results, the Department reiterates that the Petition rates is

an established, calculated margin tied to the "actual selling behavior" of an SRA company.  The

Department discusses the Petition rate with the same reliability of Chengen's margin.  The

Department's characterization is utterly misplaced.  Chengen's margin is based on Chengen's

complete actual verified data on the cost of production and sales cost for over 300 sales to the

United States.

The Petition rate is based on estimated costs of production from a U.S. producer of

plywood and a price quote.  The Department attempts to argue that the U.S. producer

consumption rates and production process are highly similar to the Chinese producers, but the

record actually contains information to the contrary.  Fourth Remand at 36.  As discussed in

depth earlier in this Court proceeding, unlike the U.S. manufacturing, Chinese producers do not

use continuous production methods and rely heavily on manual production.  Therefore, Chinese

producers can use every piece of wood veneer even if they are cracked, split or pock-mocked

with holes. The workers manually repair all these defects during the veneer assembly/production

stage with tape and glue, as observed by the Department at verification.  Second Remand Results

at 29-30 (discussing observations at verification support the yield loss); **ECF113**. That is the

---

[4] Sales value adjusted to $[               ] divided by PUDD [               ] equals [      ]%.  *See*
Second Remand Results Analysis Memorandum (June 18, 2020).

reason why Chinese producers, and Chengen, realized a comparatively higher yield rate of veneers from logs. Said another way: Chinese producers waste less wood.

The surrogate value differences between the Petition rate and Chengen's margin are also significant. The Petition rate is based on surrogate values from Thailand supplied only by the Petitioner (and again, to match factors of production for a U.S. company that were then compared to a single price quote) while Chengen's margin is based on surrogate values from Romania selected by the Department and submitted by all parties. The Department attempts to dismiss such surrogate value concerns raised before the agency in comments, stating that Thailand is an economically comparable country and parties argued for Thailand during the course of the investigation. Fourth Remand at 35. This ignores the fundamentally different posture of surrogate values submitted by a single party in the Petition compared to the vetted surrogate value process during the actual investigation that Commerce concludes constitute the "best available information" on the record for those surrogate values. 19 U.S.C. 1677b(c)(1) ("the valuation of the factors of production shall be based on the best available information regarding the values of such factors…").

The surrogate value data on the record in the investigation, even the Thai data, is presented in a fundamentally different way than the Petition. Only the Petitioner submits the data in the Petition. In contrast, all interested parties in the investigation have multiple opportunities to submit surrogate data. Parties begin by submitting surrogate country comments, then parties are given an opportunity to provide rebuttal information. Then parties submit an initial round of surrogate value data, and parties are provided the opportunity to provide rebuttal information. Then there is opportunity up until 30 days prior to the preliminary determination to continue to submit surrogate information and rebuttal information. Through this process, the

nature of the inputs consumed by actual mandatory respondents and the comparability of applicable surrogate values is fully vetted by all the parties. Then the Department determines which surrogate country and values are the best available information. Subsequently, parties brief these issues and the Department makes a final determination with respect to the surrogate values.

And again, these surrogate values were applied to actual factors of production ("FOP") data (materials, labor, energy) from a Chinese respondent rather than estimated costs from a U.S. producer. And again, the resulting normal values was applied to Chengen's substantial number of verified sales on a CONNUM specific bases rather than to a price quote from a single non-verified company. The Petition rate may be reasonable information to initiate an investigation and a reasonable rate to apply as an adverse inference to a non-cooperating party, but on the record of this investigation it is not a reasonable indicator of the dumping margins of the cooperating SRA Plaintiffs when the Department has Chengen's margin as well as additional information from the SRA Plaintiffs and voluntary respondents.

The Department continually refers to the "limited" information on the record but then on the other hand unreasonably limits its inquiry to the Petition and the Petition SRA Exporter's information. Indeed, the Department discusses the Petition rate as being more reliable evidence of dumping than the voluntary respondent data from Jiangyang Wood placed on the record. This is surely arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."). The Department says there was no "further inquiry in the form of a supplemental questionnaire" and the data was unvetted. Remand Results at 37. Of course, the Petition rate was not subject to further inquiry and was not vetted or verified.

Jiangyang Wood provided full questionnaires on the record, including a sales database with

[     ] sales.  Jiangyang Wood was poised to be verified.

Chengen's sales prices ranged from [                    ], with a weighted-average price

of [               ].  *See* Chengen Supp. Qre (May 5, 2017) at Exhibit SQ6-1 (revised U.S. Sales

Database); **CR493, 497, PR623**.  Jiangyang Wood's sales prices ranged from [

          ], with a weighted-average price of [                ].  Jiangyang Wood Section C Qre

(February 28, 2017) at Exhibit C-1; **CR289, PR351**.  Jiangyang Wood, also an SRA Plaintiff,

actually had a [      ] weighted average sales price than Chengen.  The Department also refused

to consider Bayley's sales data.  Bayley provided a full U.S. sales database.  While the

Department ultimately applied total AFA to Bayley, that determination did not undermine its

own U.S. sales invoice data of record.  The AFA determination had nothing to do with Bayley's

reporting of its sales data.  Bayley's sales prices ranged from [                    ], with a

weighted-average price of [               ].  Bayley Section C Qre (February 28, 2017) at Exhibit

C-1; **CR269, PR344**.  Therefore Bayley's sales data, based on [     ] sales, at a minimum also

demonstrates a [      ] weighted average sales price than Chengen was prevalent in the

marketplace.

Further, as already raised before this Court, even looking at the data from the Separate

Rate Applications as compiled by the Department in the third remand, show that numerous SRA

companies had sales prices in the range of or higher than Chengen's sales prices.  *See* Dep't

Third Remand Results (March 22, 2021) at Attachment 1.  For example, for birch plywood

(same material as Chengen's plywood) sales invoices in the SRA companies' applications, the

prices ranged from [                         ] compared to Chengen's lowest selling price

of [               ].  *See* Third Remand Results at 20.  Even taking only the companies with sales

prices' lower than Chengen, the prices are not so much lower as to justify the increase from [

]% to 57.36%.  Further, the Petition SRA Exporter, the basis of the Department initial

pricing comparisons, actually had two sales of birch plywood in its sales package in the separate

rate application.  The first had a price of [                    ] and the second had a price of [

].  Petition SRA Exporter SRA at Exhibit 1; [                    ].  The additional sales

invoices on the record in their SRA Supplemental questionnaire also show sales of subject

merchandise in range or higher than Chengen's sales prices, with prices from [

], in addition to the [                ] invoice that the Department chose to only highlight.

Petition SRA Exporter Supplemental SRA at [              ]; [                  ]. Thus even the

limited information from this single company does not support the Department's conclusion that

the SRA companies' pricing is different than Chengen's pricing or that these companies are

dumping at such materially higher levels than Chengen – i.e. [          ]%, much less 57.36%.  This

evidence from the entire record that Commerce is obligated to consider does not support the

Department's conclusion that the SRA Plaintiff margin must be higher than 0%.  Even if some

companies had a lower sales price than Chengen on one sale, this does not entail that the margin

of 57.36 percent is reasonably reflective of their potential dumping rather than Chengen's

margin, particularly in light of the fact that Chengen's margin is actually steeply negatively

dumped, at [        ]%.

The Department also restates its assertion from the third remand that there are some

selling behavior variances between the SRA Plaintiffs and Chengen.  Fourth Remand at 30.  The

Court did not find this persuasive in the earlier remand and has no reason to find this relevant or

persuasive now.  The Department has offered no reason why any variance between selling

behaviors would indicate that SRA Plaintiffs must be selling at dramatically lower prices than

PUBLIC VERSION

Chengen such that they would be dumping---indeed, the prices from these companies on the record demonstrate they are not dumping.  The Department has not cited to "credible economic evidence" that the SRA companies' dumping would be remotely represented by the 57.36% margin.

Lastly, the Department's remand does not address the overarching issue that applying a total AFA margin to the cooperating SRA Plaintiffs is unreasonable and not reflective of their potential dumping *per se*.  SRA Plaintiffs direct the Court to their argument on this point already raised before the Court that the AFA rate is not representative.  DH SRA Remand Comments (August 3, 2020) at 1-12, **ECF118**; DH SRA Third Remand Comments (May 3, 2021), **ECF166**.

The *Bestpak* Court held that it was unreasonable to ascribe to cooperating exporters found to be separate from the Chinese State any rate assigned to such a state-controlled entity. The Department is averaging a total adverse facts rate and a *de minimis* rate for fully cooperating respondents in contravention of the clear holding of *Bestpak*.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.").  The *Bestpak* panel found the evidentiary support for the Department's methodology—attributing the theoretical adverse AD rate of the PRC Entity to the cooperating separate rate exporters—severely lacking:

> This court does not find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence. Commerce only received detailed information from one mandatory respondent: Yama. Jintian's estimated AUV, with little

10

connection to its calculated dumping margin, is not enough. In other words, Commerce really only had one substantiated and calculated basis for dumping margins and that information came from Yama. Commerce cannot base a determination of economic reality on such slim findings. There must be more.

*Bestpak* at 1379.

In *Changzhou Hawd*, drawing on *Albemarle*, the Court observed that the record not only contained no information to suggest the separate rate firms were not similar to the cooperating respondents, but in fact, the only reasonable way to construe the record was to support a finding that cooperating respondents *are* similar to the cooperating respondent. *Changzhou Hawd*, 848 F.3d at 1012 (Indeed, under Commerce's reasoning, the separate-rate firms' decisions to respond to the questionnaires might suggest that they are more similar to other firms, like the mandatory respondents, that responded."). The SRA Plaintiffs have responded to all inquiries made by the Department. They have established they are separate from the Chinese Government. They have fully cooperated. Following court precedents and the premise of the statutory provision for limiting individual review, the Department must assume that these separate rate companies' pricing behavior is similar to the pricing behavior of the cooperating respondent, Chengen. The specific record information on this appeal discussed above (i.e. the other pricing data on the record) also only supports this conclusion.

## II. The Court Must Order the Department to Recalculate the Separate Rate Plaintiff's Margin and the Voluntary Respondents' Margin.

While the Court has previously sustained the Department's determination that Chengen's 0.00% rate alone is not representative of the SRA Plaintiffs' actual dumping margins, the SRA Plaintiffs submit that given the Department's continued inability to determine another reasonable method that is reasonably reflective of the cooperating SRA Plaintiff's margin, reliance on

Chengen's 0.00% rate alone should be reconsidered and found sufficiently reasonable as a surrogate for the SRA Plaintiffs' rates. The Court's decision was also made without the information, as discussed above, that Chengen's margin is actually quite negative at [       ]%. Therefore, relying on a zero margin already takes into account that the SRA Plaintiff's potential sales prices could be much lower than Chengen's sales prices. Indeed, while the Department primarily highlights the Petition SRA Exporter's rate alone, the other SRA companies had sale prices in range or even higher than Chengen's sale prices—thereby indicting that Chengen's rate would in fact be representative of the SRA Plaintiffs' dumping.

Accordingly, the SRA Plaintiffs submit that the Court should find that, given the Department failure after multiple opportunities to find another reasonable margin, and given the additional information only corroborating the representativeness of Chengen's margin, the SRA Plaintiffs should be assigned the only margin calculated based on the actual investigation record and based on the verified information of a cooperating company – i.e., Chengen's margin of 0.00%.

Further, the Department's remand largely overlooks the voluntary respondents. Throughout the remand results, the Department frequently cites to the limited record but then unreasonably rejects substantial information on the record—i.e. the voluntary questionnaire responses submitted by Jiangyang Wood. As discussed in earlier comments before the Court, the Department has a pattern of limiting respondent selection, refusing to select voluntary respondents, and then due to the limited respondent selection, encounters issues calculating the separate rate margin. In this case, the Department limited themselves to only two mandatory respondents, despite Jiangyang Wood requesting to be a voluntary respondent and submitting complete questionnaire responses to the record. Even when the Department determined to apply

AFA to Bayley, a fact that become evident prior to the Preliminary Determination, the Department continued to refuse to select an additional respondent.  And now on remand, the Department has continually refused to consider their data or unique posture in the case while concurrently stating the record is limited.

While not commented upon by the Court in its recent remand, the SRA Plaintiffs also maintain their positions raised in the earlier remand results before the Department and the Court regarding exclusion from the Order or the inclusion of a voluntary respondent.  DH SRA Third Remand Comments (May 3, 2021); **ECF166**.  Specifically, the SRA Plaintiffs maintain that 1) after assigning the SRA Plaintiffs the 0.00%, the Department should exclude them from the orders, 2) or at a minimum, exclude the voluntary respondents from the Order, or 3) alternatively, the Department could also calculate a margin based on the full voluntary response placed on the record by Xuzhou Jiangyang Wood Industries Co., Ltd.  The SRA Plaintiffs do not repeat these arguments here as no further discussion or determination has been offered by the Department that impacts the comments made earlier regarding these issues.

## III.    Conclusion

Based on the foregoing, the Court should order the Department to only apply the rate individually calculated for the cooperating exporter deemed separate from the Chinese State Entity, i.e, Chengen, to the rates for other exporters deemed separate from the Chinese State Entity, i.e. the SRA Plaintiffs.  The Court should also instruct the Department to assign the voluntary applicants, Jiangyang Wood, Linyi Sanfortune, and Xuzhou Longyuan, Chengen's zero margin and exclude them from the Order.  Alternatively, the Court could instruct the Department to use the voluntary questionnaire data and surrogate value data on the record to calculate a margin for Jiangyang Wood and exclude the voluntary applicants as appropriate.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com

* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

Date: December 29, 2021

## <u>WORD COUNT CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 4,041 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.
Washington, D.C. 20005
*Counsel to Plaintiff*