NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **LINYI CHENGEN IMPORT AND EXPORT CO., LTD.,**<br><br>                    **Plaintiff,**<br><br>          **and**<br><br>**CELTIC CO., LTD.,** *et al.,*<br><br>                    **Consolidated Plaintiffs,**<br>          **and**<br><br>**TARACA PACIFIC, INC.,** *et al.,*<br><br>                    **Plaintiff-Intervenors,**<br><br>     **v.**<br><br>**UNITED STATES,**<br><br>                    **Defendant,**<br><br>          **and**<br><br>**COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,**<br><br>                    **Defendant-Intervenor.** | **Before: Hon. Jennifer Choe-Groves,**<br>                    **Judge**<br><br>**Consol. Court No. 18-00002**<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>**Business Proprietary Information Removed from Pages 11 and 12** |

## <u>DEFENDANT-INTERVENOR THE COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD'S COMMENTS IN SUPPORT OF COMMERCE'S REMAND REDETERMINATION</u>

Timothy C. Brightbill, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

February 2, 2022

Consol. Ct. No. 18-00002                                NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   BACKGROUND ................................................................................................2

III.  COMMERCE'S MARGIN CALCULATION FOR SEPARATE RATE
      RESPONDENTS IS REASONABLE, FULLY EXPLAINED, AND
      BASED ON SUBSTANTIAL RECORD EVIDENCE ......................................6

      A.   This Court Already Sustained Commerce's Finding that Linyi
           Chengen's Zero Percent Margin Would Not Reasonably Reflect the
           Separate Rate Companies' Potential Dumping .........................................7

      B.   Commerce Properly Considered Evidence Regarding the Likely
           Variation in the Separate Rate Companies' Selling Behavior and the
           Resulting Effect on Potential Levels of Dumping ...................................8

      C.   Commerce Properly Rejected Using Data from Bayley and
           Jiangyang Wood ..................................................................................10

      D.   Commerce Properly Relied on Information in the Petition ......................12

      E.   Commerce Did Not Err By Including the AFA Rate in Its
           Calculation of the Separate Rate Companies' Margin ...........................14

IV.   CONCLUSION ................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albemarle Corp. v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016)...................................................................14

*Amanda Foods (Viet.) Ltd. v. United States,*
    34 CIT 730, 714 F. Supp. 2d 1282 (2010) ................................................14

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
    971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ...........................................15

*Bosun Tools Co. v. United States,*
    No. 21-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ...................6, 14

*Changzhou Hawd v. United States,*
    848 F.3d 1006 (Fed. Cir. 2017)..................................................................14

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
    701 F.3d 1367 (Fed. Cir. 2012)..................................................................15

*Navneet Publ'ns (India) Ltd. v. United States,*
    999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...........................................14

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013)............................................................14, 15

**Statutes**

19 U.S.C. § 1673d(c)(5)(B) ...............................................................................6

Consol. Ct. No. 18-00002                                    NON-CONFIDENTIAL VERSION

## I.    **<u>INTRODUCTION</u>**

On behalf of Defendant-Intervenor the Coalition for Fair Trade in Hardwood Plywood ("Defendant-Intervenor"), we respectfully submit the following comments in support of the fourth remand determination submitted by the Department of Commerce ("Commerce") on November 10, 2021, in the subject proceeding. Final Results of Redetermination Pursuant to Ct. Remand, *Linyi Chengen Imp. & Exp. Co. v. United States*, Consol. Ct. No. 18-00002, Slip Op. 21-127 (CIT Sept. 24, 2021) (Nov. 10, 2021), ECF No. 205 ("Fourth Remand Determination").

In accordance with the Court's September 24, 2021 opinion, Commerce provided an expanded, reasoned explanation of its decision to calculate a dumping margin of 57.36% for the non-selected separate rate companies in the underlying proceeding, which was based on a simple average of mandatory respondent Linyi Chengen Import and Export Co., Ltd.'s ("Linyi Chengen") zero percent rate and the rate assigned to the China-wide entity, which includes mandatory respondent Shandong Dongfang Bayley Wood Co., Ltd. ("Bayley"). *See id.* at 14. In doing so, Commerce identified record evidence demonstrating that Linyi Chengen's zero percent margin would not be reflective of the separate rate companies' potential dumping, that the separate rate companies had potential dumping margins during the period of investigation ("POI") of up to 144.72%, and that the selling behavior of the separate rate companies likely varied during the POI. *See id.* at 12. Based on this information, Commerce found that, while the petition rates did provide an indication of the potential dumping by the separate rate companies, these rates alone would not reflect the variation in their selling behavior and that, accordingly, averaging the zero percent margin for Linyi Chengen and the 114.72% from the petition was a reasonable method. *See id.* at 12-13.

For the reasons discussed below, Defendant-Intervenor agrees with Commerce's remand determination on the margin calculated for the separate rate companies. Specifically, Commerce's remand fully addresses the Court's concerns, and it is supported by substantial evidence. Moreover, none of the comments submitted in opposition to Commerce's remand demonstrate that the agency's determination is in error or that a different result is required. Comments in Opp'n to the Fourth Remand Redetermination on Behalf of Consol. Pls. Zhejiang Dehua TB Import & Export Co., Ltd. *et al.* (Dec. 29, 2021), ECF No. 208 ("Zhejiang Comments"); Consol. Pls. Taraca Pacific Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corp., Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPly LLC Comments in Opp'n to the Fourth Remand Redetermination (Dec. 29, 2021), ECF No. 209 ("Taraca Comments"); Consol. Separate Rate Pls.' Comments in Opp'n to Fourth Remand Redetermination (Dec. 29, 2021), ECF No. 210 ("SRA Pls. Comments"). Therefore, this Court should sustain Commerce's November 10, 2021 remand.

## II.    **BACKGROUND**

The case at hand arises from an antidumping duty investigation into hardwood plywood from China. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Hardwood Plywood Products from the People's Republic of China*, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final deter. of sales at less than fair value, and final affirm. deter. of critical circumstances, in part), P.R. 871 ("IDM"). The Court has four times remanded the original results with instructions for Commerce to reconsider certain aspects of its final determination involving the margins calculated for the mandatory respondents and non-selected separate rate companies in the proceeding. In Commerce's second remand redetermination, at the direction of the Court and

under respectful protest, Commerce adjusted Linyi Chengen's margin to consider documents that Linyi Chengen submitted at verification. *See Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349, 1353-54 (Ct. Int'l Trade 2020) ("*Chengen III*"). As a result, Commerce calculated a zero percent margin for Linyi Chengen, thereby removing Linyi Chengen from the antidumping order entirely, and calculated a dumping margin for the separate rate companies by averaging Linyi Chengen's zero percent rate and the China-wide rate. *Id.* at 1357-58. Commerce based its decision on the fact that a zero percent margin would not reflect the potential dumping margin for the separate rate companies because the other mandatory respondent, Bayley, submitted data that diverged from Linyi Chengen's data and the rates calculated in the petition were far in excess of zero percent and were based on price quotes for a company that was granted separate rate status (the "Petition SRA Exporter"). Final Results of Redetermination Pursuant to Ct. Remand, *Linyi Chengen Imp. & Exp. Co. v. United States*, Consol. Ct. No. 18-00002, Slip Op. 20-22 (CIT Feb. 20, 2020) (June 18, 2020) at 48-50, ECF No. 113. In considering Commerce's second remand determination, the Court found that the agency's calculation of the separate rate was not supported by substantial evidence. *Chengen III*, 487 F. Supp. 3d at 1358-59. In particular, the Court found that Commerce failed to point to evidence supporting the conclusion that one mandatory respondent's lack of cooperation and designation as part of the China-wide entity indicated that the separate rate companies' potential dumping was different from Linyi Chengen's. *Id.* at 1357-58. The Court also found that the margins contained in the petition did not support the conclusion that the separate rate companies' potential dumping was different from Linyi Chengen's "because the margins in the Petition are 'untethered' to the actual dumping margins of the Separate Rate Plaintiffs." *Id.* at 1358. As a result, the Court issued another remand for

Commerce to provide more evidence in support of its determination or to change its determination. *Id.* at 1358-59.

On remand, Commerce again used "any reasonable method" to calculate the separate rate companies' margin of 57.36% by applying the simple average of Linyi Chengen's zero percent rate with Bayley's 114.72% adverse facts available ("AFA") rate. Final Results of Redetermination Pursuant to Ct. Remand, *Linyi Chengen Imp. & Exp. Co. v. United States*, Consol. Ct. No. 18-00002, Slip Op. 20-183 (CIT Dec. 21, 2020) (Mar. 22, 2021) at 47, ECF No. 144. Commerce explained that relying only on the zero percent margin calculated for Linyi Chengen was not appropriate because it would not be reasonably reflective of the potential dumping of the separate rate companies. *Id.* at 24-25. Commerce also determined that the estimated dumping margins in the petition were representative of the selling behavior of the separate rate respondents and cited a commercial invoice used to establish the dumping level in the petition for products similar to products sold by Linyi Chengen at a similar price. *Id.* at 17. Commerce explained that Linyi Chengen sold the same products at prices almost 20% higher than the price shown on the invoice from the Petition SRA Exporter and inferred that "the likelihood of the products sold by the Petition SRA Exporter being made at dumped prices is significantly greater than at the price sold by {Linyi} Chengen during the POI." *Id.* at 18-19. Commerce concluded, based on its review of the commercial invoice, that the approximately 20% difference between the prices of the Petition SRA Exporter and Linyi Chengen supported the agency's application of a 57.36% rate to the separate rate companies. *Id.* at 19.

In reviewing Commerce's third remand determination, the Court sustained "Commerce's determination that Linyi Chengen's 0% rate would not be representative of the separate rate respondents' actual dumping margins." *Linyi Chengen Imp. & Exp. Co. v. United States*,

539 F. Supp. 3d 1269, 1277 (Ct. Int'l Trade 2021) ("*Chengen IV*"). However, "{b}ecause Commerce cited as record evidence only one commercial invoice showing an approximately 20% price difference, the Court concludes that Commerce's 57.36% separate rate assigned to the voluntary cooperating Separate Rate Plaintiffs is not reasonable and is unsupported by substantial evidence." *Id.* at 1278.

In its fourth remand determination, Commerce continued to calculate the margin for the separate rate companies based on the average of zero percent and 114.72%. *See* Fourth Remand Determination at 12-13. In doing so, Commerce explained that "the record provides no opportunity for Commerce to know or to calculate the actual dumping margins of the Separate Rate Plaintiffs and, thus, it is not possible . . . to determine with certainty whether any particular rate is an accurate estimate of the actual dumping margins of the Separate Rate Plaintiffs." *Id.* at 11 (footnote omitted). Commerce also explained that, other than Linyi Chengen's margin, "the only alternative rates in this case are limited to the rates listed in the Petition," which were based on actual price quotes for subject merchandise exported during the POI by a company that was a significant exporter and a separate rate recipient in the investigation. *Id.* at 10-11. Further, Commerce highlighted that the record indicated that, while the separate rate companies had potential dumping margins of up to 114.72%, it was reasonable to conclude that their selling behavior was varied and, accordingly, that the rates calculated in the petition "would not reflect this variation in selling behavior . . . ." *Id.* at 12. Thus, because neither the petition rates nor Linyi Chengen's rate alone fully reflected the potential dumping of the separate rate companies, Commerce found "that a reasonable method to determine the separate rate is to average the rates determined in this segment of the proceeding . . . ." *Id.*

As discussed in greater detail below, Commerce's remand determination complies with the Court's remand instructions. Commerce's remand is fully explained, provides substantial evidence to support its determination, and should be sustained.

## III.    COMMERCE'S MARGIN CALCULATION FOR SEPARATE RATE RESPONDENTS IS REASONABLE, FULLY EXPLAINED, AND BASED ON SUBSTANTIAL RECORD EVIDENCE

Commerce's decision to assign a simple average of the China-wide rate and Linyi Chengen's zero percent rate for purposes of calculating the margin for separate rate respondents is reasonable, in accordance with 19 U.S.C. § 1673d(c)(5)(B), and supported by the record. Notably, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") recently affirmed Commerce's calculation of the separate rate companies' margin based on the simple average of the zero percent margin and AFA rate applied to the two mandatory respondents.[1] *Bosun Tools Co. v. United States*, No. 21-1929, 2022 WL 94172, at *1-3 (Fed. Cir. Jan. 10, 2022) (nonprecedential). In doing so, the Court explained that Commerce is permitted to include an AFA rate in its separate rate calculation, that the resulting rate was supported by the other rates on the record, and that the respondent's proposed alternative of relying only on the zero percent margin was not realistic in light of the record. *Id.* at *3-6.

The approach used by Commerce here is consistent with this case and fully supported by the record. As Commerce explained, there are three calculated rates on the record: the zero percent margin calculated for Linyi Chengen and the 104.06% and 114.72% margins calculated in the

---

[1]    Defendant-Intervenor notes that, in the administrative review underlying the Court's decision in *Bosun*, Commerce had followed the "expected method" where all calculated rates are *de minimis* and/or based entirely on AFA. *Bosun Tools Co. v. United States*, No. 21-1929, 2022 WL 94172, at *2-3 (Fed. Cir. Jan. 10, 2022). Defendant-Intervenor notes further that the respondent to which AFA was applied rebutted the presumption of government control, but the AFA rate was equal to the China-wide rate. *Id.* at *2 n.3.

petition. Fourth Remand Determination at 10-11. This Court has already sustained as reasonable Commerce's finding that Linyi Chengen's zero percent margin would not be reasonably reflective of the separate rate companies' potential dumping. *See id.* at 12. Commerce also explained that, while it has previously highlighted the 20% differential in selling prices between Linyi Chengen and the Petition SRA Exporter, this alone was not indicative of the difference in potential dumping between those companies. *Id.* at 13. Commerce further explained that the separate rate companies had potential dumping margins of up to 114.72%, as evidenced by the petition and supported by the Petition SRA Exporter's submissions, but that their selling behavior likely varied. *Id.* at 12. As such, Commerce concluded that averaging Linyi Chengen's zero percent margin and the 114.72% rate applied to the China-wide entity was a reasonable methodology based on record evidence, as it accounted for the likely range of potential dumping by the separate rate companies. *Id.* at 12-13. Notwithstanding Commerce's explanation, Respondents argue that the calculation of the margin for the separate rate companies is unreasonable and unsupported and should not be sustained. For the reasons explained below, these arguments should be rejected.

## A.   This Court Already Sustained Commerce's Finding that Linyi Chengen's Zero Percent Margin Would Not Reasonably Reflect the Separate Rate Companies' Potential Dumping

To start, underlying Respondents' arguments is the claim that Linyi Chengen's zero percent margin should be applied to the separate rate companies. *See* Taraca Comments at 10-11; Zhejiang Comments at 4; SRA Pls. Comments at 11-12. However, this Court has already sustained Commerce's determination that Linyi Chengen's margin would not be reasonably reflective of the separate rate companies' potential dumping. *See Chengen IV*, 539 F. Supp. 3d at 1276-77. In particular, the Court explained that:

> Commerce has reasonably supported its determination to depart from the expected
> method because the Separate Rate Plaintiffs' potential dumping margins would not
> be represented by Linyi Chengen's 0% dumping margin in light of evidence
> reviewed by Commerce, including the comparability of a Petition price quote to a
> price from the Petition Separate Rate Application, differences between Linyi
> Chengen's and the Separate Rate Plaintiffs' pricing and cost structures, and
> commercial invoices showing disparities between the Separate Rate Plaintiffs' and
> Linyi Chengen's selling activities.

*Id.* at 1276. Respondents have provided no basis for reconsidering this determination other than to

claim that Commerce's remand determination is unsupported. *See* Taraca Comments at 10-11;

Zhejiang Comments at 4; SRA Pls. Comments at 11-12. As such, any arguments in favor of

assigning Linyi Chengen's zero percent margin to the separate rate companies should be rejected.

*See* Fourth Remand Determination at 28-29.

### B.   Commerce Properly Considered Evidence Regarding the Likely Variation in the Separate Rate Companies' Selling Behavior and the Resulting Effect on Potential Levels of Dumping

Respondents' incorrectly argue that Commerce ignored evidence regarding potential

dumping by the separate rate companies. In particular, Respondents point to information showing

that some sales made by the separate rate companies were at prices above Linyi Chengen's prices

and that Linyi Chengen's "actual" dumping margin was negative. SRA Pls. Comments at 4-5,

8-9; Taraca Comments at 5-6, 8-10; Zhejiang Comments at 3-5. These arguments ignore

Commerce's determination. Commerce expressly recognized that the selling behaviors of the

separate rate companies likely varied and that some companies may have been dumping at levels

closer to Linyi Chengen. *See* Fourth Remand Determination at 31, 38-39. It was for this reason

that Commerce concluded that it was not appropriate to rely on the petition rates alone for the

separate rate companies' margin. *Id.* at 12-13, 30-31. Instead, based on this information,

Commerce found that, "{b}y averaging Chengen's zero percent rate with the China-wide entity

rate (which is based on the highest Petition rate) we account for those Separate Rate Plaintiffs

whose dumping behavior may more closely adhere to the levels of the Petition SRA Exporter as well as those whose dumping behavior may be more similar to that of Chengen's." *Id.* at 31. Thus, contrary to Respondents' contentions, Commerce did consider the range in pricing on the record for the separate rate companies and incorporated that information into its determination. Respondents fail to explain why this examination and determination does not constitute a sufficient consideration of the evidence regarding the variation in the separate rate companies' pricing.

For the same reason, Respondents' arguments that Commerce improperly disregarded the selling price differential between the Petition SRA Exporter and Linyi Chengen, as well as the fact that Linyi Chengen's margin was "actually much lower" than zero are meritless. SRA Pls. Comments at 4-5; Zhejiang Comments at 3-4; Taraca Comments at 8-10. According to Respondents', a price difference of 20% does not support a margin of 57.36% for the separate rate companies because the separate rate companies' could have been dumping at levels lower than Linyi Chengen and because, even if Linyi Chengen's prices were 20% lower, its dumping margin "would still be steeply negative . . . ." SRA Plaintiffs Comments at 4-5; Zhejiang Comments at 3-4; Taraca Comments at 8-10. First, Respondents' arguments incorrectly conflate the 20% difference in the selling price between Linyi Chengen and the Petition SRA Exporter with a 20% difference in the level of dumping. This is inaccurate. In addressing the Court's comments in *Chengen IV* regarding approximately 20% difference between the price at which Linyi Chengen sold the same product as the Petition SRA Exporter, Commerce explained that this price difference alone was "not indicative of the potential level of dumping by that exporter" because it does not take normal value into account. Fourth Remand Determination at 13. In other words, the 20% price difference does not equate to a 20% difference in the level of dumping. *See id.* at 13-14, 36. However, this price difference does indicate that the Petition SRA Exporter engaged in different pricing behavior

from Linyi Chengen and thus may have been dumping at different levels such that Linyi Chengen's margin alone would not serve as a good proxy rate. *Id.* at 13. This conclusion is further supported by the fact that the petition indicated that the actual dumping for this company could have been as high as 114.72%. *Id.* at 13-14. Second, as discussed above, Commerce recognized that some of the separate rate companies may have been dumping at levels closer to that of Linyi Chengen and took this into account in its calculation of the margin for the separate rate companies. *See id.* at 31, 38-39. Accordingly, Commerce properly considered the relevance of the 20% price difference, including the limitations of these data, as well as the fact that other separate rate companies may have had selling prices and normal values that differ from that of Linyi Chengen and of the Petition SRA Exporter.

### C.   Commerce Properly Rejected Using Data from Bayley and Jiangyang Wood

Respondents also aim to undermine Commerce's determination by arguing that the agency improperly ignored data from Bayley and Xuzhou Jiangyang Wood Industries Co. ("Jiangyang Wood").[2] SRA Pls. Comments at 8, 12-13. But this ignores Commerce's actual findings. To start, as Commerce explained, it would not be appropriate to use Bayley's data because the agency found "this company's data to be unreliable as a basis for calculating an individual dumping margin given the application of total AFA" in the investigation. Fourth Remand Determination at 38. While Respondents assert that the application of AFA does not undermine Bayley's U.S. sales data, SRA Pls. Comments at 8, Commerce specifically found in the underlying investigation that "Bayley failed to provide correct information regarding the company's total sales" and that it was "unable to rely on Bayley's reported sales information for purposes of calculating a dumping margin." IDM at 13.

---

[2]   Jiangyang Wood had requested treatment as a voluntary respondent and submitted responses to the initial questionnaire. *See* SRA Pls. Comments at 7-8.

**Business Proprietary Information Has Been Deleted**

Commerce likewise explained that it was inappropriate to rely on Jiangyang Wood's data because the company's questionnaire responses have not been subject to further inquiry. Fourth Remand Determination at 37. While Respondents claim that the rates calculated in the petition also were not subject to further inquiry, SRA Pls. Comments at 8, this is incorrect. As part of the pre-initiation phase, Commerce undertakes a detailed analysis of petitions, including the calculation of dumping margins, and requests additional information and clarification as appropriate, and this process was undertaken with respect to the hardwood plywood petition as well. *See* AD Investigation Initiation Checklist (Dec. 8, 2016) at 6-10, C.R. 22-26, P.R. 47-51 ("AD Initiation Checklist"). As such, Commerce properly rejected using data from Bayley and Jiangyang Wood to calculate the separate rate companies' margin.

Respondents' arguments that Bayley's and Jiangyang's weighted-average prices undermine Commerce's determination also fall short, as they are based on incomplete data. SRA Pls. Comments at 8. Specifically, Respondents argue that the weighted-average sales prices for Bayley and Jiangyang Wood are [                    ] Linyi Chengen's weighted-average sales price, suggesting that prices [                                        ]. *Id.* However, Commerce found that a comparison of prices alone is of limited relevance for determining the extent of dumping because it ignores half the necessary equation in a dumping calculation, *i.e.*, normal value.[3] *See* Fourth Remand Determination at 13. Moreover, as explained above, Commerce

---

[3]      The limited relevance of this analysis is further highlighted by the fact that [



                    ]. Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Supplemental Section A, C, and D Response* (May 15, 2017) at Exhibit SQ6-1.1, C.R. 493-502, P.R. 623-625;

**Business Proprietary Information<br>Has Been Deleted**

already took into consideration the fact that the separate rate companies' selling behaviors, and extent of dumping, could have varied. *See id.* at 38-39. Consequently, Bayley's and Jiangyang's weighted-average prices do not detract from Commerce's determination or otherwise demonstrate that it is unsupported.

### D.    Commerce Properly Relied on Information in the Petition

Respondents' arguments that Commerce erred in relying on the petition rates because those data were unvetted and relied on Thailand as the surrogate country are likewise unpersuasive. SRA Pls. Comments at 6-8; Taraca Comments at 6-8; Zhejiang Comments at 4. As noted above, the petition rates were examined by Commerce as part of the pre-initiation phase of the investigation. *See* AD Initiation Checklist at 6-10. Thus, Commerce examined the data and the calculations used and determined that they were reasonable and reliable. Further, as Commerce explained, although Romania was ultimately used as the primary surrogate country in the investigation, Thailand is a market economy that was at a level of economic development comparable to China and was a significant producer of comparable merchandise. Fourth Remand Determination at 35. In fact, parties advocated for Thailand to be the primary surrogate country. *Id.* Thus, the fact that the petition rates were calculated using Thailand as the surrogate country does not undermine their relevance or accuracy. *See id.* And, notably, Respondents do not identify any particular surrogate

---

Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Section C Response* (Feb. 28, 2017) at Exhibit C-1, C.R. 269-270, P.R. 344; Letter from deKieffer & Horgan, PLLC to Sec'y Commerce, re: *Hardwood Plywood Products from the People's Republic of China: Voluntary Section C Response* (Feb. 28, 2017) at Exhibit C-1, C.R. 289-292, P.R. 351 ("Jiangyang Section C Response"). Additionally, it appears that Respondents have relied [

]. SRA Pls. Comments at 8; Jiangyang Section C Response at Exhibit C-1.

value data in the petition that are inappropriate, aberrational, or unreliable. *See* SRA Pls.

Comments at 6-8; Taraca Comments at 6-8; Zhejiang Comments at 4.

Additionally, Respondents' argument that Commerce erred in relying on the petition rate

because the agency stated that they represented the separate rate companies' dumping only "to some

extent" misunderstands the agency's determination. Taraca Comments at 7-8. As discussed above,

Commerce recognized that, while the petition rates were indicative of potential dumping by the

separate rate companies, the selling behavior of these companies likely varied. *See* Fourth Remand

Determination at 30-31. As such, Commerce found that it was not appropriate to rely only on the

petition rates for the separate rate companies' margin. *See id.* Thus, it is unclear why Respondents

consider Commerce to have erred in relying on the petition rates only in part given that Commerce

considered this information to be partially representative of the separate rate companies' dumping.

Respondents similarly ignore the agency's determination in faulting Commerce for relying on the

higher of the two petition rates even though it stated that "there {was} no basis to choose between

the two." Taraca Comments at 6. As Commerce explained, its practice is to consider petition rates

as equally representative, and thus there was no basis for considering one more representative than

the other. Fourth Remand Determination at 12. Commerce ultimately relied on the higher of the

two petition rates because that rate, along with the zero percent margin calculated for Linyi

Chengen, took into consideration the likely range of dumping by the separate rate companies. *Id.*

at 31.[4] Respondents fail to explain why this determination is unsupported or unreasonable.

---

[4]       Respondents also incorrectly assert that Commerce "presumes, without citation to specific
record evidence, that 'the average of {the two petition} rates considers the likely range of dumping
behavior' by the Separate Rate Plaintiffs." Taraca Comments at 7 (quoting Fourth Remand
Determination at 31). An examination of the remand determination makes clear that Commerce
was stating that it considered Linyi Chengen's zero percent margin and the highest petition rate to
indicate the range of dumping by the separate rate companies. Fourth Remand Determination at 31.

Consol. Ct. No. 18-00002                                    NON-CONFIDENTIAL VERSION

**E.    Commerce Did Not Err By Including the AFA Rate in Its Calculation of the
        Separate Rate Companies' Margin**

Respondents argue that Commerce's determination is unsupported because it relies in part

on the AFA rate. SRA Pls. Comments at 10-11; Taraca Comments at 11-13; Zhejiang Comments

at 5-6. These arguments should be rejected in light of Federal Circuit precedent and the record of

this investigation. To start, the Federal Circuit has recognized that Commerce is permitted to use

an AFA rate in calculating the rate for non-individually examined companies. *See Yangzhou

Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); *Bosun*, 2022

WL 94172, at *4-5. This was articulated in *Yangzhou Bestpak*, in which the Court stated that the

statute "and the SAA explicitly allow Commerce to factor both *de minimis* and AFA rates into the

calculation methodology." *Yangzhou Bestpak*, 716 F.3d at 1378. The Federal Circuit recently

reaffirmed this in *Bosun Tools Co v. United States*, in which the Court affirmed the calculation of

the margin for the separate rate companies based on averaging the zero percent margin and AFA

rate that were applied to the mandatory respondents. 2022 WL 94172, at *2. Accordingly, the fact

that the separate rate companies' margin here was based in part on the rate used as the AFA rate

does not render Commerce's approach unreasonable or unsupported.

Respondents nonetheless claim that the use of an AFA rate was unreasonable here as applied,

arguing that the facts mimic those underlying *Yangzhou Bestpak*.[5] Zhejiang Comments at 7; SRA

---

[5]    Respondents also point to other cases they content support their argument here, but these
cases are readily distinguishable. *See* SRA Pls. Comments at 11; Taraca Comments at 11; Zhejiang
Comments at 6-7. *Changzhou Hawd*, *Navneet*, and *Amanda Foods* addressed Commerce's
departure from the expected methodology without sufficient basis for doing so. *Changzhou Hawd
v. United States*, 848 F.3d 1006, 1008 (Fed. Cir. 2017); *Navneet Publ'ns (India) Ltd. v. United
States*, 999 F. Supp. 2d 1354, 1357 (Ct. Int'l Trade 2014); *Amanda Foods (Viet.) Ltd. v. United
States*, 34 CIT 730, 731, 714 F. Supp. 2d 1282, 1285 (2010). Similarly, *Albemarle* addressed
Commerce's departure from the expected methodology and did not address the application of
AFA. *Albemarle Corp. v. United States*, 821 F.3d 1345, 1349-50 (Fed. Cir. 2016). *Changzhou
Wujin* addressed the inclusion of an AFA rate in the separate rate calculation where the AFA rate

14

Consol. Ct. No. 18-00002                                   NON-CONFIDENTIAL VERSION

Pls. Comments at 10-11. While the Court in *Yangzhou Besípak* did find that the averaging of the mandatory respondents' zero percent margin and AFA rate was unreasonable as applied, the Court made clear that its determination was based on the specific facts of that case. *Yangzhou Besípak*, 716 F.3d at 1378-80. In particular, the Court found that Commerce had failed to support its calculation because the only support it offered was the fact that the separate rate company's estimated AUV was similar to the simple averages of the estimated AUVs of the mandatory respondents. *Id.* at 1378-79. The Court concluded that, without more, Commerce's determination was not supported. *Id.* In contrast, here, Commerce provided a detailed discussion of the information on the record supporting its determination, including dumping margins calculated for one of the separate rate companies and record information demonstrating that Linyi Chengen's margin was not representative of the separate rate companies' likely dumping. Fourth Remand Determination at 10-14. As such, Commerce has provided substantial evidence to support the margin calculated for the separate rate companies, including support for the inclusion of the rate used as the AFA rate, and, consequently, the conclusion of the Federal Circuit in *Yangzhou Besípak* does not apply here.

---

was not applied to any party in the proceeding and was calculated specifically for the purpose of calculating the separate rate and with deterrence in mind. *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1375-78 (Fed. Cir. 2012). The Court in *Baroque Timber* remanded where Commerce departed from the expected methodology and "did not explain why it made {its} choice or how the result was in any way reasonably reflective of Plaintiffs' economic reality." *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2014).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant-Intervenor respectfully requests that the Court find that Commerce's calculation of the separate rate companies' margin is supported by substantial evidence and otherwise in accordance with law, and sustain Commerce's remand redetermination.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

February 2, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this submission complies with the word limitation requirement. The word count for the Defendant-Intervenor the Coalition for Fair Trade in Hardwood Plywood's Comments in Support of the Remand Redetermination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,970 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition for Fair Trade in Hardwood Plywood
(Representative Of)

February 2, 2022
(Date)
